984 P.2d 1138 (1999)
194 Ariz. 501
Roger DEMASSE; Maria A. Garcia; Billy W. Jones; Viola Munguia; Greg Palmer; Socorro Soza, Plaintiffs-Appellants.
v.
ITT CORPORATION, a Delaware Corporation dba ITT Cannon, Defendant-Appellee.
No. CV-97-0177-CQ.
Supreme Court of Arizona, En Banc.
May 25, 1999.
*1140 Jack Levine, Phoenix, Attorney for Plaintiffs-Appellants.
Bryan Cave L.L.P. By: John Alan Doran, Teresa D. Forst, Sherin S. Vitro, Merritt L. Bingham, Phoenix, Attorneys for Defendant-Appellee.
Ryley, Carlock & Applewhite By: Michael D. Moberly, Phoenix, Attorneys for Amicus Curiae Phelps Dodge Corporation.
Quarles & Brady By: Jon E. Pettibone, Phoenix, Attorneys for Amicus Curiae Cyprus Climax Metals Company.
David C. Larkin, P.C. By: David C. Larkin, Tempe, Attorney for Amici Curiae Sharon Dick, Dianne Aragon, and Elizabeth Prior.
The Langerman Law Offices By: Amy G. Langerman, Richard W. Langerman, Phoenix, Attorneys for Amicus Curiae Arizona Employment Lawyers Association.

OPINION
FELDMAN, Justice.
¶ 1 The United States Court of Appeals for the Ninth Circuit certified to us two questions of Arizona law. We have jurisdiction pursuant to article VI, § 5(6) of the Arizona Constitution, A.R.S. § 12-1861, and Rule 27, Arizona Rules of the Supreme Court.
¶ 2 The certified questions are:
1. Once a policy that an employee will not be laid off ahead of less senior employees becomes part of the employment contract under Leikvold v. Valley View Community Hospital, 141 Ariz. 544, 688 P.2d 170 (1984), as a result of the employee's legitimate expectations and reliance on the employer's handbook, may the employer thereafter unilaterally change the handbook policy so as to permit the employer to layoff employees without regard to seniority?
2. In order to sue for breach of contract on the ground that an employer is bound by representations made in its handbook, must employees exhaust the complaint procedure described in the same handbook?
*1141 ¶ 3 The questions certified posit that the layoff seniority provision has become part of the employment contract. See Leikvold, 141 Ariz. at 546, 688 P.2d at 172. Using this assumption, we respond to each question in the negative.

FACTS AND PROCEDURAL HISTORY
¶ 4 ITT Cannon ("ITT") is a Delaware corporation primarily engaged in defense contracting in the Phoenix area. ITT hired Roger Demasse, Maria A. Garcia, Billy W. Jones, Viola Munguia, Greg Palmer, and Socorro Soza (collectively "Demasse employees") as hourly workers at various times between 1960 and 1979. Although it is unclear when ITT first issued an employee handbook, evidently there have been five editions, the most recent in 1989.
¶ 5 Because the complete handbooks are not part of our record, we decide this case in the context of the limited provisions before us, using the certified question's predicate that the seniority layoff promise became part of the Demasse employees' contract. Thus the questions of which terms in the manual and what additional circumstances, if any, formed the implied-in-fact contract are left for the federal court. See Leikvold, 141 Ariz. at 548, 688 P.2d at 174 (holding that whether any particular manual provision modifies any particular employment-at-will relationship and becomes part of the particular employment contract is a question of fact). Given the question certified, we take as a fact that the seniority layoff provision was contractual.[1]
¶ 6 We note, however, that all five handbooks apparently included the seniority layoff provision. The earliest version provided simply that layoffs within each job classification would be made in reverse order of seniority. Later versions also gave more senior employees the ability to "bump" less senior employees. The issues presented focus on the 1989 handbook, which included two new provisions. First, a disclaimer added to the first page "Welcome" statement provided that "nothing contained herein shall be construed as a guarantee of continued employment.... ITT Cannon does not guarantee continued employment to employees and retains the right to terminate or layoff employees." ITT Cannon Handbook for Hourly Employees 1989, Appellant's Brief, Appendix V, at 24. Second, this Welcome statement included a new modification provision, which read:
Within the limits allowed by law, ITT Cannon reserves the right to amend, modify or cancel this handbook, as well as any or all of the various policies, rules, procedures and programs outlined in it. Any amendment or modification will be communicated to affected employees, and while the handbook provisions are in effect, will be consistently applied.
Id. The 1989 edition also provided that "specific provisions of policies, rules, procedures and programs supersede[] the contents of this handbook," thus apparently allowing ITT to modify specific provisions through methods other than issuing a new handbook. Id. When the 1989 handbook was distributed, ITT employees signed an acknowledgment that they had received, understood, and would comply with the revised handbook. Demasse v. ITT Corp., 915 F.Supp. 1040, 1043 (D.Ariz.1995).
¶ 7 Four years passed before ITT notified its hourly employees that effective April 19, 1993, its layoff guidelines for hourly employees would not be based on seniority but on each employee's "abilities and documentation of performance." Demasse, Soza, and Palmer were laid off ten days after the new policy went into effect, Munguia five days later, and Jones and Garcia almost nine months later. All were laid off before less senior employees but in accordance with the 1993 policy modification.
¶ 8 The Demasse employees brought an action in federal district court alleging they were laid off in breach of an implied-in-fact contract created by the pre-1989 handbook provisions requiring that ITT lay off its employees according to seniority. The parties *1142 filed cross-motions for summary judgment. The court first examined ITT's handbook disclaimer statements and, as a matter of law, found them not clear and conspicuous enough to prevent formation of an implied-in-fact contract. Id. at 1043-44. Instead, the judge found the language "could be read to mean that termination or layoff will always be completed according to the terms provided in the handbook." Id. at 1044. Thus, whether an implied-in-fact contract covering layoff seniority rights had been created remained a question of fact precluding summary judgment on that issue. Id. (citing Wagenseller v. Scottsdale Mem'l Hosp., 147 Ariz. 370, 382, 710 P.2d 1025, 1037 (1985); Leikvold, 141 Ariz. at 548, 688 P.2d. at 174).
¶ 9 As a second, dispositive matter, however, the judge ruled that even if an implied-in-fact contract had been created, only the provisions of the most recent handbook provided its presently enforceable terms. See id. (citing Chambers v. Valley Nat'l Bank, 721 F.Supp. 1128, 1131 (D.Ariz.1988)). Under this interpretation, the terms of the Demasse employees' implied-in-fact contract with ITT at any given time were those of ITT's most recently published handbook. Id. at 1044-45. Consequently, the judge found that when ITT modified the handbook in 1989, the newly added and amended terms automatically became part of the contract, including the modification provision authorizing subsequent unilateral changes. Id. at 1045. As a result, when ITT distributed the 1993 "revised layoff policy," which removed seniority rights and stated that it superseded previous handbooks, ITT validly and unilaterally modified the contract. Id. Because only the 1989 terms, as amended by the 1993 notice, were in effect when the Demasse employees were laid off, the judge held as a matter of law that ITT "did not breach the contract." Id. at 1046. The judge thus allowed ITT to unilaterally alter its contract with the Demasse employees.
¶ 10 On appeal, the Ninth Circuit agreed that Leikvold controls the issue of whether the older handbooks' seniority provisions became part of the employment contract. Demasse v. ITT Corp., 111 F.3d 730, 733 (9th Cir.1997). But unlike the district court, the circuit court recognized that the truly difficult question was "whether ITT could unilaterally change layoff policies which were an enforceable part of the Demasse employees' contract of employment by simply issuing the 1989 handbook declaring that it could amend its handbooks and policiesand then [implementing that provision] by modifying its layoff policy in 1993." Id. at 734. ITT argued that as a matter of Arizona law it was "free" to "discard a layoff selection methodology that had become outdated."[2]Id. at 733. The Demasse employees responded that ITT could not remove its contractual seniority layoff provision without additional consideration. Id. The circuit court recognized that the federal district courts had concluded that Arizona law recognized continued employment alone as sufficient consideration to modify the contract terms so that when employees continued to work after a new handbook was distributed, the new edition superseded prior editions. Id. at 734-35. The circuit court then observed that although the district courts have so construed Arizona law, no Arizona appellate court has directly addressed this issue. Thus, the court certified the question to us. Id. at 735-36.

QUESTION 1

A. The implied-in-fact contract
¶ 11 Because we answer the first question on its premise that a contract exists, we discuss the implied-in-fact contract term only to distinguish the present situation from a complete at-will agreement. The difference is dispositive with regard to methods necessary for modification.
¶ 12 Complete at-will employment is for an indefinite term, and American courts have come to hold it can be terminated at any time for good cause or no cause at the will of either party. See, e.g., Wagenseller, 147 Ariz. at 375-76, 710 P.2d at 1030-31. At-will employment contracts are unilateral *1143 and typically start with an employer's offer of a wage in exchange for work performed; subsequent performance by the employee provides consideration to create the contract. See Wagner v. City of Globe, 150 Ariz. 82, 85, 722 P.2d 250, 253 (1986) (citing 1A A. CORBIN, CORBIN ON CONTRACTS § 152, at 13-14 (1963)). Thus, before performance is rendered, the offer can be modified by the employer's unilateral withdrawal of the old offer and substitution of a new one: the employer makes a new offer with different terms and the employee again accepts the new offer by performance (such as continued employment). Thus a new unilateral contract is formeda day's work for a day's wages. See id.; Pine River State Bank v. Mettille, 333 N.W.2d 622, 626-27 (Minn.1983); see also Mattison v. Johnston, 152 Ariz. 109, 112, 730 P.2d 286, 289 (App.1986). But the parties are free to create a different relationship beyond one at will "and define the parameters of that relationship, based upon the totality of their statements and actions." Wagner, 150 Ariz. at 86, 722 P.2d at 254.
¶ 13 Arizona recognizes that implied-in-fact contract terms may create an exception to employment that is completely at will. See Wagenseller, 147 Ariz. at 376, 710 P.2d at 1031. While employment contracts without express terms are presumptively at will, an employee can overcome this presumption by establishing a contract term that is either expressed or inferred from the words or conduct of the parties. See id. at 381, 710 P.2d at 1036; Leikvold, 141 Ariz. at 548, 688 P.2d at 174. When so inferred, the implied-in-fact term is part of the contract. Wagenseller, 147 Ariz. at 381, 710 P.2d at 1036. An example of such a term is one that offers the employee job securityone specifying the duration of employment or limiting the reasons for dismissal. See id.; Leikvold, 141 Ariz. at 548, 688 P.2d at 174; see also Berube v. Fashion Ctr. Ltd., 771 P.2d 1033, 1044 (Utah 1989).
¶ 14 When employment circumstances offer a term of job security to an employee who might otherwise be dischargable at will and the employee acts in response to that promise, the employment relationship is no longer at will but is instead governed by the terms of the contract. See Wagenseller, 147 Ariz. at 381-83, 710 P.2d at 1036-38; Leikvold, 141 Ariz. at 546-48, 688 P.2d at 172-74; see also Carroll v. Lee, 148 Ariz. 10, 13, 712 P.2d 923, 926 (1986); Swingle v. Myerson, 19 Ariz.App. 607, 609, 509 P.2d 738, 740 (1973) ("There is no difference in the legal effect between an express contract and an implied contract.").
¶ 15 This, of course, does not mean that all handbook terms create contractual promises. A statement is contractual only if it discloses "a promissory intent or [is] one that the employee could reasonably conclude constituted a commitment by the employer. If the statement is merely a description of the employer's present policies ... it is neither a promise nor a statement that could reasonably be relied upon as a commitment." Soderlun v. Public Serv. Co., 944 P.2d 616, 620 (Colo.App.1997). An implied-in-fact contract term is formed when "a reasonable person could conclude that both parties intended that the employer's (or the employee's) right to terminate the employment relationship at-will had been limited." Metcalf v. Intermountain Gas Co., 116 Idaho 622, 778 P.2d 744, 746 (1989) (citing Wagenseller, 147 Ariz. at 381, 710 P.2d at 1036; Duldulao v. St. Mary of Nazareth Hosp. Ctr., 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987); 1A A. CORBIN, supra § 17, at 38 (1960)).
¶ 16 When an employer chooses to include a handbook statement "that the employer should reasonably have expected the employee to consider as a commitment from the employer," that term becomes an offer to form an implied-in-fact contract and is accepted by the employee's acceptance of employment. Soderlun, 944 P.2d at 621. Thus, handbooks can include a variety of non-promissory information for employees: the company's mission, employee guidelines, expressions of policy regarding opening and closing hours, and benefits. While a handbook generally promulgates company rules, mostly non-contractual in nature, only a few substantively govern the employee's job and employment expectations. See Richard J. Pratt, Unilateral Modification of Employment *1144 Handbooks: Further Encroachments on the Employment-At-Will Doctrine, 139 U. PA. L. REV. 197, 205 (1990).

B. Modification
¶ 17 ITT argues that it had the legal power to unilaterally modify the contract by simply publishing a new handbook. But as with other contracts, an implied-in-fact contract term cannot be modified unilaterally. See Stephen Carey Sullivan, Unilateral Modification of Employee Handbooks: A Contractual Analysis, 5 REGENT U.L. REV. 261, 286 (1995). Once an employment contract is formedwhether the method of formation was unilateral, bilateral, express, or implieda party may no longer unilaterally modify the terms of that relationship.[3]See id.; Toth v. Square D Co., 712 F.Supp. 1231, 1235-36 (D.S.C.1989); see also Thompson v. Kings Entertainment Co., 674 F.Supp. 1194, 1198 (E.D.Va.1987) (holding modification is not automatic and effective solely on issuance of new handbook); but see Fleming v. Borden, Inc., 316 S.C. 452, 450 S.E.2d 589 (1994); Progress Printing v. Nichols, 244 Va. 337, 421 S.E.2d 428 (1992).[4]
¶ 18 The cases dealing with employment contracts are merely part of the general rule that recognizes no difference in legal effect between an express and an implied contract. See Carroll, 148 Ariz. at 13, 712 P.2d at 926 (citing RESTATEMENT (SECOND) OF CONTRACTS § 19 cmt. a (hereinafter RESTATEMENT)). Thus an implied-in-fact employment term must be governed by the same traditional contract law that governs express promises and must be modified accordingly. See McIlravy v. Kerr-McGee Corp., 119 F.3d 876, 881 (10th Cir.1997); Yeazell v. Copins, 98 Ariz. 109, 115-16, 402 P.2d 541, 545-46 (1965) ("He who asserts the modification of a contract has the burden of proof."); Bishop Realty v. Perk Inc., 292 S.C. 182, 355 S.E.2d 298, 300-01 (1987). As a result, to effectively modify a contract, whether implied-in-fact or express, there must be: (1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration. See Toth, 712 F.Supp. at 1235-36; see also McIlravy, 119 F.3d at 881; Robinson v. Ada S. McKinley Community Serv. Inc., 19 F.3d 359, 364 (7th Cir.1994); Doyle v. Holy Cross Hosp., 186 Ill.2d 104, 237 Ill.Dec. 100, 708 N.E.2d 1140, 1144 (1999); Brodie v. General Chem. Corp., 934 P.2d 1263, 1268 (Wyo.1997).
¶ 19 The 1989 handbook, published with terms that purportedly modified or permitted modification of pre-existing contractual provisions, was therefore no more than an offer to modify the existing contract. See Toth, 712 F.Supp. at 1236; Thompson, 674 F.Supp. at 1197. Even if the 1989 handbook constituted a valid offer, questions remain whether the Demasse employees accepted that offer and whether there was consideration for the changes ITT sought to effect.
1. Continued employment alone does not constitute consideration for modification
¶ 20 Under Arizona law, consideration necessary to modify an existing contract is "any detriment to promise[e], or benefit to promisor" that supports the new promise. Stovall v. Williams, 100 Ariz. 1, 4, *1145 409 P.2d 711, 713 (1966); see also USLife Title Co. v. Gutkin, 152 Ariz. 349, 354, 732 P.2d 579, 584 (App.1986); RESTATEMENT § 71. Moreover, legal consideration, "like every other part of a contract, must be the result of agreement. The parties must understand and be influenced to the particular action by something of value ... [that is] recognized by all [parties] ... as the moving cause." Yuma Nat'l Bank v. Balsz, 28 Ariz. 336, 343, 237 P. 198, 200 (1925). Consideration will be found when an employer and its employees have made a "bargained for exchange to support [the employees'] ... relinquishment of the protections they are entitled to under the existing contract." Doyle v. Holy Cross Hosp., 289 Ill.App.3d 75, 224 Ill.Dec. 507, 682 N.E.2d 68, 72 (1997), aff'd 186 Ill.2d 104, 237 Ill.Dec. 100, 708 N.E.2d 1140 (1999).
¶ 21 The cases ITT cites[5] hold that continued work alone both manifested the Demasse employees' assent to the modification and constituted consideration for it. We disagree with both contentions and the cases that support them. Separate consideration, beyond continued employment, is necessary to effect a modification. See McIlravy, 119 F.3d at 880; Brodie v. General Chem. Corp., 112 F.3d 440 (10th Cir.1997); Robinson, 19 F.3d at 364 (Under Illinois law acceptance and consideration "cannot be inferred from [employee's] continued work"; there must be some benefit to employee, detriment to employer, or employee's continued work under new manual must have been bargained-for exchange.); Doyle, 237 Ill.Dec. 100, 708 N.E.2d at 1144 (when employee has implied-in-fact job security term, continued work gives no benefit to employee and works no detriment to employer and thus is not consideration); Jewell v. North Big Horn Hosp. Dist., 953 P.2d 135, 138 (Wyo.1998); Michael Starr, Blasts from the Past: Superseded Employment Handbooks Live On, 12 No. 8 CORP. COUNS. 1, 14 (1998) (stating that it is not uncommon for courts to require that new consideration be something beyond continued employment).
¶ 22 The Tenth Circuit Court of Appeals recently dealt with this issue in McIlravy. Kerr-McGee issued five handbooks over a twelve-year span. The early handbooks contained a seniority layoff provision. Later handbooks contained disclaimer provisions expressly stating that employment with Kerr-McGee was at will. Applying Wyoming law, the Tenth Circuit held that Kerr-McGee failed to show that the disclaimer successfully modified the pre-existing implied-in-fact contract created by the earlier handbooks. 119 F.3d at 881. To effect a modification, Kerr-McGee had to show an offer, assent, and consideration. Id. "As far as consideration is concerned, an employee's continued employment will not suffice for modification that restores at-will status; separate consideration must be provided." Id. (citing Brodie, 934 P.2d at 1269). Following Brodie and McIlravy, as well as the other cases cited above, we, too, hold that continued employment alone is not sufficient consideration to support a modification to an implied-in-fact contract. Any other result brings us to an absurdity: the employer's threat to breach its promise of job security provides consideration for its rescission of that promise.

2. Acceptance
¶ 23 Continued employment after issuance of a new handbook does not constitute acceptance, otherwise the "illusion (and the irony) is apparent: to preserve their right under the [existing contract] ... plaintiffs would be forced to quit." Doyle, 237 Ill.Dec. 100, 708 N.E.2d at 1145 (citing Doyle, 224 Ill.Dec. 507, 682 N.E.2d at 68). It is "too much to require an employee to preserve his or her rights under the original employment contract by quitting working." Brodie, 934 P.2d at 1268; see Robinson, 19 F.3d at 364; Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 662 A.2d 89, 99 (1995). Thus, the employee does not manifest consent to an offer modifying an existing contract without taking affirmative steps, beyond continued performance, to accept.

*1146 There is no doubt that the parties to a contract may by their mutual agreement accept the substitution of a new contract for the old one with the intent to extinguish the obligation of the old contract, but one party to a contract cannot by his own acts release or alter its obligations. The intention must be mutual.
Yeazell, 98 Ariz. at 116, 402 P.2d at 546 (quoting York v. Central Ill. Mut. Relief Ass'n, 340 Ill. 595, 173 N.E. 80, 83 (1930)); see also Thompson, 674 F.Supp. at 1199. If passive silence constituted acceptance, the employee "could not remain silent and continue to work. Instead [he] would have to give specific notice of rejection to the employer to avoid having his actions construed as acceptance. Requiring an offeree to take affirmative steps to reject an offer ... is inconsistent with general contract law." Thompson, 674 F.Supp. at 1199 (citing 1 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 91 (W. Jaeger 3d ed.1957)). The burden is on the employer to show that the employee assented with knowledge of the attempted modification and understanding of its impact on the underlying contract. See Toth, 712 F.Supp. at 1235-36; see also Robinson, 19 F.3d at 364; Bartinikas v. Clarklift, Inc., 508 F.Supp. 959, 961 (N.D.Ill.1981); Torosyan, 662 A.2d at 98-99.
¶ 24 To manifest consent, the employee must first have legally adequate notice of the modification. See Helle v. Landmark, Inc., 15 Ohio App.3d 1, 472 N.E.2d 765, 777 (1984) ("[A]ny contemplated modification would require legally adequate notice to the employees of the proposed change, in addition to the other elements of contract modification."). Legally adequate notice is more than the employee's awareness of or receipt of the newest handbook. See Toth, 712 F.Supp. at 1235-36 (mere receipt of revised manual is not consent to proposed modification). An employee must be informed of any new term, aware of its impact on the pre-existing contract, and affirmatively consent to it to accept the offered modification. See Preston v. Claridge Hotel & Casino, Ltd., 231 N.J.Super. 81, 555 A.2d 12, 16 (1989) (employees were "oriented" with handbook that explained what they could expect in terms of employment and what would be expected of them, but when employees were issued "revised" handbooks, they were not "reoriented" as to significance of newly added contractual disclaimer, thus preventing disclaimer from taking effect).
¶ 25 When ITT distributed the 1989 handbook containing the provisions permitting unilateral modification or cancellation, it did not bargain with those pre-1989 employees who had seniority rights under the old handbooks, did not ask for or obtain their assent, and did not provide consideration other than continued employment. The employees signed a receipt for the "1989 handbook stating that they had received the handbook[,] understood that it was their responsibility to read it, comply with its contents, and contact Personnel if they had any questions concerning the contents." Demasse, 915 F.Supp. at 1043. The Demasse employees were not informed that continued employmentshowing up for work the next daywould manifest assent, constitute consideration, and permit cancellation of any employment rights to which they were contractually entitled. Thus, even if we were to agree that continued employment could provide consideration for rescission of the job security term, that consideration would not have been bargained for and would not support modification. Thus, even if we were to agree that continued employment could provide consideration for rescission of the job security term, that consideration would not have been bargained for and would not support modification. Our courts have not adopted any conflicting principle.
C. Arizona courts have not recognized an employer's right to unilaterally modify a pre-existing implied-in-fact employment contract
¶ 26 The notion that Arizona law allows an employer to unilaterally modify a pre-existing implied-in-fact employment contract to restore employees to discharge-at-will status originates from Bedow v. Valley Nat'l Bank, 5 IER cases 1678, 1680, 1988 WL 360517 (D.Ariz.1988). The Bedow court held that "as a matter of basic contract law, each successive version of defendant's personnel *1147 policy manual modifies and supersedes prior issued versions," citing only out-of-state cases as direct support. Id. Although there was no Arizona law on point, the judge concluded that Arizona law implicitly supported such a holding, citing Mattison, 152 Ariz. 109, 730 P.2d 286. Id. But Mattison's holding that continued employment for a substantial period of time was sufficient consideration to support a post-employment restrictive covenant agreement was made in a case in which the court of appeals believed it was dealing with only complete at-will employment. 152 Ariz. at 112, 730 P.2d at 289. Unlike the present case, the Mattison employees had no job security term. Thus, even if Mattison's holding is correct, it cannot control what consideration would be necessary to modify a contract containing such a term. We do not believe Mattison should apply to either the situation in Bedow or the present case.
¶ 27 In a subsequent case, a United States district court judge held an employer's unilateral addition of a disclaimer in a revised handbook was valid even though it destroyed pre-existing implied-in-fact job security terms. Chambers, 721 F.Supp. 1128 (citing Mattison and Leikvold). Like Bedow, Chambers relied on Mattison for the conclusion that "an offer of a modification to a unilateral contract of employment ... [can be] accepted by continuing ... employment," even though Mattison dealt only with at-will discharge. Id. at 1131-32. Chambers also cited Leikvold for the proposition that an employer could add a contractual disclaimer that returned the relationship to at-will status. Id. at 1131. Thus Chambers assumed the validity of any unilateral amendment made by the employer during the time the contract was in effect and looked only to the handbook terms existing at the time the employee was terminated. Id. Despite the fact the employee in Chambers was hired and worked for fourteen years under an implied-in-fact job security term, Chambers permits the employer to unilaterally disclaim those provisions and terminate the employee. Id. at 1129, 1132.
¶ 28 If Chambers is good law, Leikvold's implied-in-fact exception is meaningless. If a contractual job security provision can be eliminated by unilateral modification, an employer can essentially terminate the employee at any time, thus abrogating any protection provided the employee. For example, an employer could terminate an employee who has a job security provision simply by saying, "I revoke that term and, as of today, you're dismissed"no different from the full at-will scenario in which the employer only need say, "You're fired." This, of course, makes the original promise illusory. We therefore disagree with Chambers and Bedow.
¶ 29 Leikvold gives employers a method to avoid creating implied-in-fact relationships from handbook representations but does not permit retroactive and unilateral rescission of contractual terms. 141 Ariz. at 548, 688 P.2d at 174. The case holds that an employer is "certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells [its] employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer." Id. We followed that language, however, with the statement that "if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it. Having announced a policy, the employer may not treat it as illusory." Id. Nothing could be more illusory than to hold that after an employer makes contractual promises, it may issue a new handbook that unilaterally rescinds them, then fire its employees in violation of its original but since obviated promises.
¶ 30 In the briefs and at oral argument, as well in the dissents, there was a note of concern that holding that an employer could not cancel existing contractual terms by issuing a new handbook would be a radical departure from Arizona law. We blaze no new ground in this opinion. It has always been Arizona law that a contract, once made, must be performed according to its terms and that any modification of those terms must be made by mutual assent and for consideration. See Angus Med. Co. v. Digital Equip. Corp., *1148 173 Ariz. 159, 164, 840 P.2d 1024, 1029 (App. 1992); Nationwide Resources Corp. v. Massabni, 134 Ariz. 557, 563, 658 P.2d 210, 215 (App.1982); Coronado Co. v. Jacome's Dep't Store, Inc., 129 Ariz. 137, 140, 629 P.2d 553, 556 (App.1981); Yeazell, 98 Ariz. at 115-16, 402 P.2d at 545-46. To those who believe our conclusion will destroy an employer's ability to update and modernize its handbook, we can only reply that the great majority of handbook terms are certainly non-contractual and can be revised, that the existence of contractual terms can be disclaimed in the handbook in effect at the time of hiring and, if not, permission to modify can always be obtained by mutual agreement and for consideration. In all other instances, the contract rule is and has always been that one should keep one's promises.

D. Justice Jones' dissent
¶ 31 All concede, including ITT and the dissent, that the question certified requires us to assume the handbook and whatever other dealings may have taken place between ITT and the Demasse employees created a contractual provision that restricted ITT's ability to discharge. Nevertheless, the dissent argues, this relationship was still completely at will in naturean offer of a day's wages for a day's work. Dissent at ¶¶ 58.[6] This view cannot survive the posture of the case as presented, for then the promise could have been revoked on the very day made and on any day thereafter. The certified question does not posit an unenforceable, illusory contract.
¶ 32 How the contract is labeled"at will," "at will but modified by an implied-in-fact term," or "implied in fact"is not the issue. Whatever the label, the question assumes there was a contract including the job security provision, so the issue in this case is simply whether that contractual term, express or implied-in-fact, may be unilaterally rescinded by ITT. The dissent evidently agrees that this is the issue because the dissenting opinion is primarily directed at the proposition that ITT could unilaterally modify the contract by inserting the disclaimer provision in the 1989 handbook and then issuing the 1993 change revoking the layoff provision.
¶ 33 The dissent first argues that this 1989 modification was effective because ITT provided consideration by continuing to provide jobs and because the Demasse employees manifested their assent by continuing to work at their jobs. Dissent at ¶¶ 63-64. The dissent finds legal support for this position because ITT retained the ability to shut down the whole operation at any time, and its failure to do so constituted consideration for the modification. Dissent at ¶ 63. Further consideration is found in the fact that the Demasse employees did not exercise their right to quit. Dissent at ¶ 64. We are unable to agree with this view of the employment relationship. The Illinois Supreme Court answered a similar argument in words we believe are applicable to the dissent:
[W]e are unable to conclude that consideration exists that would justify our enforcement of the modification against existing employees. Because the defendant was seeking to reduce the rights enjoyed by the plaintiffs under the employee handbook, it was the defendant, and not the plaintiffs, who would properly be required to provide consideration for the modification. But in adding the disclaimer to the handbook, the defendant provided nothing of value to the plaintiffs and did not itself incur any disadvantage. In fact, the opposite occurred: the plaintiffs suffered a detrimentthe loss of rights previously granted to them by the handbookwhile the defendant gained a corresponding benefit.
For these reasons, we agree with the plaintiffs that, after an employer is contractually bound to the provisions of an employee handbook, unilateral modification of its terms by the employer to an employee's disadvantage fails for lack of consideration.... Applying well-established principles of contract law, these courts have held that modifications to terms and provisions *1149 of employee handbooks cannot apply to existing employees in the absence of consideration. Moreover, these cases have held that the requisite consideration for a modification that would operate to an employee's disadvantage is not supplied simply by the employee's continued work for the employer. That is to say, in addition to an offer and acceptance, consideration must be found elsewhere, ...
* * *
If, as [the employer] argues, [the employees'] continued work amounts to acceptance and consideration for the `loss' of their right under the economic-separation policy, then the only way [the employees] could preserve and enforce their contractual rights would have been to quit working after [the employer] unilaterally issued the disclaimer. This would make the promise by [the employer] not to terminate, except under the terms of the economic-separation policy, illusory. The illusion (and the irony) is apparent: To preserve their right under the economic-separation policy the [employees] would be forced to quit.
Doyle, 237 Ill.Dec. 100, 708 N.E.2d at 1144-1146 (quoting Doyle, 224 Ill.Dec. 507, 682 N.E.2d at 68) (citations omitted).
¶ 34 Of course, nothing in the agreement deprived ITT of the privilege of going out of business, merging with another company, shutting down its factory, or taking any other action not addressed in the contract. But failure to do what is permitted is not consideration unless such forbearance is bargained for. See RESTATEMENT § 71(1), (2), and cmts. b and a (substituted contract must be accepted by the obligee before it replaces the provisions of the original contract). We believe it is even more unrealistic to find consideration in whatever detriment ITT may suffer because, as the Martone dissent implies, its unilateral modification may cause declining morale in the work place. See Martone dissent at ¶ 86. The Demasse employees' unhappiness on learning that ITT would not perform its promise was certainly to be expected, but it did not provide consideration to transform ITT's anticipatory breach into a valid agreement to modify. See RESTATEMENT §§ 71 and 73.
¶ 35 As a second rationale supporting ITT's right of unilateral amendment, the dissent suggests an "express rejection of strict rules of contract modification." Dissent at ¶ 74. This argument is based on the language found in In re Certified Question/Bankey v. Storer Broadcasting Co.[7] and is described by the dissent and a commentator as an "administrative law model." Dissent at ¶ 75 (quoting HENRY H. PERRITT, JR., EMPLOYEE DISMISSAL LAW & PRACTICE § 4.44 (3d ed.1992)). We do not believe the analogy is apt. When a promise is contractual, its enforceability should be determined under the law of contracts. We do not agree that a party to a contract containing a term that proves to be inconvenient, uneconomic, or unpleasant should have the right, like an administrative agency, "to change the rules prospectively through proper procedures." Dissent at ¶ 75 (quoting PERRITT, supra § 4.44). According to Bankey, unilateral contract modification is achieved by simply publishing a new handbook with an additional clause stating that the contract has been changed. See Bankey, 443 N.W.2d at 121. We do not believe contract law recognizes such a right.
¶ 36 Next, the dissent would recognize ITT's "unilateral right to change" a contract term as a matter of "equity and pragmatic reason," citing a number of cases, including Bedow and Bankey, that purport to justify a variety of unilateral employer modifications when made in good faith in pursuit of legitimate business objectives. Dissent at ¶ 78 (quoting Bankey and citing Woolley v. Hoffmann-LaRoche, Inc., 99 N.J. 284, 491 A.2d 1257 (1985)). Accepting, arguendo, that ITT was operating in good faith and in pursuit of its legitimate business objectives in modifying the handbook, we nevertheless conclude that contract law does not give ITT the right to do so unilaterally. Woolley, in fact, rejects the approach later taken by Bankey and does not support the dissent. See Woolley, 491 A.2d at 1267. *1150 Self-interest may certainly provide a party with a legitimate business reason to request assent to a contract change, but the law has never before permitted unilateral change or excused non-performance of a contract on such a ground. Id. at 1269-71. Nor, we believe, would ITT recognize that its employees have such a unilateral right.
¶ 37 The dissent suggests certain legitimate business interests that would provide an employer with legal justification to unilaterally amend an employment contract. See dissent at ¶ 83. While such concerns may be legitimate, they do not legally justify an employer's disregard of its other contractual obligations. For example, economic hardship may force an employer to reduce its work force, although the employer may desire to keep its most productive employees and terminate the least productive ten percent. Even if the employees to be terminated have a contract limiting the employer's termination rights to situations when the employer has good cause, some cases recognize that the employer may be entitled to eliminate the least productive without regard to seniority. See, e.g., Soderlun, 944 P.2d at 619 (citing cases holding that economic hardship constitutes good cause to terminate employee). When the employees to be terminated have a contract that includes a reverse seniority provision, however, the employer can still eliminate ten percent of the work force as long as it does so in compliance with the provision binding it to first eliminate the last employees hired. Those who argue that this is not the most cost-efficient method to determine which employees should be retained must keep in mind that the employer chose to offer the reverse seniority policy, and that those who make contracts must perform. Thus we simply disagree with the cases the dissent cites for the legitimate business interests theory. See dissent at ¶ 83.
¶ 38 Finally, the dissent is correct that Leikvold holds that a handbook statement or promise will not be considered contractual in nature if an adequate disclaimer is made. See dissent at ¶ 83. But the facts hypothecated to us indicate no disclaimer was made before the contract of employment, that the layoff provision became part of the employment contract, and that ITT thereafter unilaterally attempted to change the promise. Leikvold does not say that the disclaimer can be effective when published after the contract has been made. Neither Leikvold nor any of our cases have held or stated, even in dicta, that such provisions may be inserted ex post facto, as it were, to change existing contractual provisions. The principle is well stated in Woolley and, we believe, answers the contention that enforcing contractual promises will mean the death of handbooks. Martone dissent at ¶ 86.
Our opinion need not make employers reluctant to prepare and distribute company policy manuals. Such manuals can be very helpful tools in labor relations, ... and we would regret it if the consequence of this decision were that the constructive aspects of these manuals were in any way diminished. We do not believe that they... should be diminished as a result of this opinion.
All that this opinion requires of an employer is that it be fair. It would be unfair to allow an employer to distribute a policy manual that makes the workforce believe that certain promises have been made and then to allow the employer to renege on those promises. What is sought here is basic honesty: if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal. All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement;....
491 A.2d at 1271 (emphasis added); see also Doyle, 237 Ill.Dec. 100, 708 N.E.2d at 1145.
¶ 39 The dissent attempts to reach conclusions about what the parties intended at the time they made the contract of employment. But what each party intended depends on what representations were made in the handbooks, what may have been said in *1151 the hiring process, and how each understood the bargain. We have no record from which to determine any of this, and our case law indicates such questions are ordinarily questions of fact. The district judge denied summary judgment because the nature of the bargain between the parties was a question of fact. Respectfully, we believe the dissenters err in attempting to decide these issues as if they were questions of law.

E. Justice Martone's dissent
¶ 40 The substantive portion of Justice Martone's dissent is based on Bankey, together with his views of the nature of the promise and the future of handbooks. For the reasons previously set forth, we disagree. We also refuse to follow Bankey's rationale or model.
¶ 41 In footnote 1 to his dissent, Justice Martone raises a question about the method followed to hear and decide this case. He notes that we did not reschedule oral argument after Justice Moeller retired and his successor had been appointed. Id. (citing and quoting Hazine v. Montgomery Elevator Co., 176 Ariz. 340, 344-45, 861 P.2d 625, 629-30 (1993)). His comments needlessly raise a question of institutional practice, if not integrity, and thus require that we address the matter even though it was not raised and is not before the court.
¶ 42 Hazine's procedural advice is inapplicable here because of an important factual difference. Our comments in Hazine were addressed to the situation the court faced in Bryant v. Continental Conveyor & Equipment Co., 156 Ariz. 193, 751 P.2d 509 (1988). Justice Hays had retired when Bryant was argued, and the process of filling the vacancy was under way. It was in that context that Justice Moeller, writing for the Hazine court, noted:

Bryant was argued while a vacancy on the court was in the process of being filled. A visiting judge was called in and the case was decided on a 3 to 2 basis, with the permanent members of the court splitting 2 to 2. Bryant was therefore suspect authority from the moment it was issued, particularly given the preexisting Boswell [v. Phoenix Newspapers, Inc., 152 Ariz. 9, 730 P.2d 186 (1986)] opinion. In retrospect it would have been advisable, when it became known that a split in a court in transition was occurring, to delay argument, or to have reargument.
In the recent past, this court has, when confronted with a 2 to 2 split by permanent members of the court, declined to render a decision ... [citing cases].
Hazine, 176 Ariz. at 344-45, 861 P.2d at 629-30.
¶ 43 This case, on the other hand, was argued on October 23, 1997, and a tentative disposition reached and assignment of the opinion made, as usual, at conference shortly after argument. At that time, Justice Moeller was a regularly appointed, permanent member of the court. Although final decision and filing of this opinion occurred after Justice Moeller's retirement on January 31, 1998, his participation conforms to the court's regular practice both before and after Hazine.
¶ 44 In fact, Justice Moeller participated, without objection or comment, in twenty-two other cases in which the same practice was followed, among them State v. Greene, a capital case in which Justice Martone wrote the court's opinion affirming the death penalty and Justice Moeller made the three-justice majority. 192 Ariz. 431, 967 P.2d 106 (1998).

QUESTION 2
¶ 45 The second certified question turns on whether the Demasse employees failed to exhaust the grievance procedure outlined in the employee handbook before they filed suit. Due to the lack of a complete series of ITT's handbooks, it is difficult to determine when the provision was added to the handbook. As of the 1989 version, the complaint procedure read as follows:
If you have a personal problem that is work related, or if you feel a policy, rule, or procedure in this handbook has not been fairly administered in your particular case, you [sic] first step is to discuss it frankly with your supervisor. Your supervisor is the most important person to you and your success on your job.

*1152 If, after an open discussion with your supervisor concerning your problem, you are not satisfied, ITT Cannon has an open door policy that gives you the freedom to take your problem to the next level of management within your department. If you are still not satisfied, you may also contact a representative of the Personnel Department. Remember, your first step is to take the problem to your supervisor. If this informal procedure is not satisfactory in resolving your problem in relations to the administration of a policy, rule or procedure in this handbook, you may take the option of submitting a formal complaint. The formal complaint must be in writing and submitted to the Personnel Department within five (5) workings [sic] days of the occurrence of the facts concerning the complaint. The written complaint statement must include the names of two employees selected from the department in which the complaint occurred. These two employees will serve on a complaint committee along with two other members selected by management to serve on the same committee. The complaint will then be reviewed by these four persons.
If the committee fails to reach a majority decision, the complaint may be submitted to the Division General Manager for final resolution.
Further details concerning this procedure can be obtained from your supervisor. A direct line of communication between you and your supervisor will usually resolve any work related problems.
ITT Cannon Handbook for Hourly Employees 1989, Appellant's Brief, Appendix V, at 24.
¶ 46 When the Demasse employees filed their breach of contract claim in federal court, ITT counterclaimed that the remedy for any grievance must be pursued via ITT's complaint procedure. Moreover, ITT asserted this was an exclusive remedy, barring the Demasse employees from filing suit even after their termination. ITT argues that the Demasse employees cannot sue without first exhausting the handbook grievance procedures, citing both Moses v. Phelps Dodge Corp., 818 F.Supp. 1287 (D.Ariz.1993), and Thomas v. Garrett Corp., 744 F.Supp. 199 (D.Ariz.1989). We answer the question on the assumption that the quoted complaint procedure was a part of the Demasse employees' contract.
¶ 47 We do not find helpful the two cases on which ITT relies. In Thomas, the primary issue was whether an employee handbook with a clear and conspicuous disclaimer created an implied-in-fact contract between the employer and its employees. 744 F.Supp. at 200. The judge found that due to the clarity and conspicuousness of the disclaimer, an implied-in-fact contract had not been created. At the end of the decision, the judge said that even if the handbook had created a contract, that contract included an internal grievance procedure that had to be exhausted before bringing suit. Id. at 202. Because Thomas does not provide the text of the procedure, we do not know its terms and whether it extended to complaints regarding employee termination.
¶ 48 In Moses, the court held that an employee was barred from filing suit by the express terms of the grievance procedure provided in the employees' handbook. 818 F.Supp. at 1291. The employee contended that the procedure was permissive, not mandatory, and she was therefore not required to exhaust it. Id. at 1290. The judge found, however, that the explicit text of the grievance procedure provided otherwise. Id. at 1291. Specifically, the provision read that the procedures "set forth in this Employee Handbook constitute the sole and exclusive procedure for the processing and resolution of any controversy, complaint, misunderstanding or dispute that may arise concerning any aspect of your employment or termination of your employment." Id. at 1290-91. The court found the language was clear and unambiguous and thus controlled the employee's remedy.
¶ 49 The complaint procedure in ITT's handbook is much different from the provision in Moses. ITT's complaint procedure first directs that if an employee has "a problem that is work related, or if you feel a policy, rule or procedure in this handbook has been unfairly administered in your particular case, your first step is to discuss it *1153 frankly with your supervisor. Your supervisor is the most important person to you and your success on the job." ITT argues that the Demasse employees should have utilized this procedure. But once terminated, an employee no longer has a supervisor. Thus the designated complaint avenue is cut off. See Dutrisac v. Caterpillar Tractor Co., 749 F.2d 1270, 1274 (9th Cir.1983) (to bring suit, employee must first either exhaust the contractual grievance procedure or prove he was prevented from exhausting that procedure). Additionally, the remainder of the grievance procedure provides that "if you are not satisfied, ITT Cannon gives you the freedom to take your problem to the next level of management"; if still unsatisfied, "you may contact a representative of the Personnel Department." And if the informal procedure is not satisfactory, "you may take the option of submitting a formal complaint." Finally, employees are reminded that direct communication with supervisors will "usually resolve work related problems." Nowhere does ITT's provision state that it is either an exclusive remedy or applies to breach of contract termination grievances. Thus, unlike the provision in Moses, ITT's handbook provision is permissive, not mandatory, and only contemplates resolution of work-related, not termination-related, grievances.
¶ 50 We conclude that failure to exhaust the grievance procedure does not preclude a terminated employee from filing suit. Therefore we need not address here whether a provision that provides an exclusive remedy would validly preclude a terminated employee from filing a breach of contract claim.

CONCLUSION
¶ 51 We answer the questions certified as follows:
Question 1: An employer cannot unilaterally modify and thus negate the effect of implied-in-fact contractual terms by subsequently publishing a handbook permitting unilateral modification or rescission. Modification of the terms of implied-in-fact contracts are governed by traditional contract law principles, which require assent and consideration to the offer of modification. Continued employment alone will not suffice. Because the question certified posits that the Demasse employees have a contract term providing them layoff seniority rights, ITT could not unilaterally change the handbook policy to rescind or reserve the right to rescind those provisions.
Question 2: ITT's complaint procedure does not provide either that it is an exclusive remedy or that it applies to termination grievances; therefore, the Demasse employees were not required to exhaust the complaint procedure before bringing an action for breach of contract.
CONCURRING: THOMAS A. ZLAKET, Chief Justice, JAMES MOELLER, Justice (Retired).
JONES, Vice Chief Justice, concurring in part and dissenting in part:
¶ 52 I concur in the majority's response to certified question No. 2. I also concur in that section of the majority opinion titled "Justice Martone's Dissent," dealing with a procedural matter wholly unrelated to the substantive issues in this case.
¶ 53 I respectfully dissent from that part of the majority opinion responding to certified question No. 1. The response undermines legitimate employer expectations in a remarkable departure from traditional at-will employment principles. It transforms the conventional employer-employee contract from one that is unilateral (performance of an act in exchange for a promise to pay) to one that is bilateral (a promise for a promise). The decision is unsupported by Arizona precedent and unwarranted as a matter of law.
¶ 54 The majority exacts from the certified question the premise that the employment relationship between the Demasse plaintiffs and ITT is "no longer at-will." I disagree. A single contract term in a policy manual may, while it exists, become an enforceable condition of employment, but it does not alter the essential character of the relationship. In my view, ITT, as the party unilaterally responsible for inserting it into the manual may, on reasonable notice, exercise an equal right to remove it.
*1154 ¶ 55 For purposes of this discussion, it is assumed the reverse-seniority layoff provision became part of the "employment contract" years earlier when ITT initially placed it into the policy manual and that it remained a part of the "contract" as long as it remained a part of the manual. The simple question put to us is whether ITT may unilaterally bring about its removal and thereafter be free of any prospective reverse-seniority obligation in the event of a layoff. That question does not catapult the case beyond the reach of at-will employment principles.
¶ 56 In accordance with the doctrine of Leikvold v. Valley View Community Hospital, 141 Ariz. 544, 688 P.2d 170 (1984), ITT added a contract disclaimer to its 1989 handbook: "[N]othing contained herein shall be construed as a guarantee of continued employment." In the same handbook, ITT expressly reserved "the right to amend, modify, or cancel this handbook, as well as any or all of the various policies, rules, procedures, and programs outlined within it." Each of the Demasse plaintiffs signed a certification acknowledging that the new policy had been received and reviewed.
¶ 57 The "at-will" status of the Demasse-ITT contract both before and after the 1989 amendments is confirmed by at least two factors: (1) the contract was always one of indefinite duration, and (2) the Demasse employees had the absolute right to quit at any time.
¶ 58 In Wagner v. City of Globe, 150 Ariz. 82, 722 P.2d 250 (1986), we determined that "[e]very employment contract for an indefinite term is presumed to be terminable at will." Wagner, 150 Ariz. at 84, 722 P.2d at 252; see also Wagenseller v. Scottsdale Mem'l Hosp., 147 Ariz. 370, 374, 710 P.2d 1025, 1029 (1985) (defining an at-will employee as "one hired without specific contractual term"). We further declared that an employee's ability to "quit at any time" was a central aspect of at-will employment. See Wagner, 150 Ariz. at 85, 722 P.2d at 253. The at-will relationship may, of course, be replaced by an implied-in-fact contract, but this occurs only when there is "proof of an implied-in-fact promise of employment for a specific duration." Wagenseller, 147 Ariz. at 376, 710 P.2d at 1031. Here, no durational component ever attached to ITT's reverse-seniority layoff provision or to any other aspect of the employment relationship, and ITT always afforded its employees the unrestricted right to terminate at any time. Accordingly, I view the employment arrangement between the Demasse plaintiffs and ITT as a continuing, at-will relationship.
¶ 59 The right to quit in opposition to changed policies, despite the majority's view, is properly characterized as a right. It is an inherent feature of at-will employment. The Washington Supreme Court forcefully made this point in Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984).
When the employment relationship is not evidenced by a written contract and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control over the employment relationship, unilateral acts of the employer are binding on its employees and both parties should understand this rule.
Id. at 1087 (emphasis added).
¶ 60 In Wagner, this court explained the relationship:
Employment contracts, particularly those which would be considered at-will, are the best and most typical examples of unilateral contracts. Unlike a bilateral contract, a unilateral contract does not require mutuality of obligation; but there is sufficient consideration in the form of services rendered. This is true despite the fact that the employee may quit at any time.
Id., 150 Ariz. at 85, 722 P.2d at 253 (citing 1A A. Corbin, Corbin on Contracts § 152, at 13-14 *1155 (1963)) (citation omitted) (emphasis added).
¶ 61 Wagner contemplates that modification of the at-will relationship typically occurs through distribution of an employee handbook, just as ITT anticipated in the instant case:
Because the at-will employment relationship is contractual, it can be modified by the parties at any time just as other contracts can be modified.
....
One widely accepted means of modifying the at-will contract is use or publication of personnel manuals, guides, or rules by employers. An employer's represen-tations contained in a personnel manual "can become terms of the employment contract and limit an employer's ability to discharge his or her employees," even though the personnel policies were not bargained for at the time of hiring.
Id. at 85-86, 722 P.2d at 253-54 (citation omitted) (emphasis added). We thus declared explicitly that employers have authority to modify at-will contracts and are bound by terms added after the employment relationship has begun.
¶ 62 The corollary, however, is also true: just as employers are bound currently by the terms of existing policy manuals, employees must be bound prospectively by amendments to the manual, even though a particular amendment was not bargained for at the point of hire. Hogue v. Cecil I. Walker Machinery Co., 189 W.Va. 348, 431 S.E.2d 687, 691 (1993); In re Certified Question (Bankey) v. Storer Broadcasting Co., 432 Mich.438, 443 N.W.2d 112, 120 (1989); Pine River State Bank v. Mettille, 333 N.W.2d 622, 626-27 (Minn.1983). When ITT modified its policy manual in 1989 by adding the contract disclaimer and the power to amend, and offered continuing employment to employees having received notice and having signed the acknowledgment, the employees effectively gave their acceptance to the amendment by continuing to work. Moreover, in 1993, when ITT revised its layoff policy, the employees had known for four years that such change could occur.[1]
¶ 63 The majority overlooks another point. Just as at-will employees are unilaterally free to quit at any time, employers may be unilaterally forced by economic circumstance to curtail or shut down an operation, something employers have the absolute right to do. When the employer chooses in good faith, in pursuit of legitimate business objectives, to eliminate an employee policy as an alternative to curtailment or total shutdown, there has been forbearance by the employer. Such forbearance constitutes a benefit to the employee in the form of an offer of continuing employment. The employer who provides continuing employment, albeit under newly modified contract terms, also provides consideration to support the amended policy manual.
¶ 64 Such is the nature of the at-will contract; consideration is found in the employer's offer of continuing employment, and the employee accepts the offer by his continued performance. Wagner, 150 Ariz. at 85, 722 P.2d at 253. Under the unilateral theory, continuing performance by the employee at a *1156 job that the employer continues to offer, subject to modified terms, manifests acceptance of the new terms. See id.; Pine River, 333 N.W.2d at 626-27; see also Mattison v. Johnston, 152 Ariz. 109, 112-13, 730 P.2d 286, 289-90 (App.1986) (continued employment is sufficient consideration for the modification of an at-will employment contract by amendment added subsequent to the date of hire).
¶ 65 The majority imposes a bilateral principle on the at-will relationship by holding that in order for ITT to eliminate the reverse-seniority layoff policy, some form of new consideration, in addition to an offer of continuing employment, is necessary to support each individual employee's assent to the amended manual. The majority's approach effectively mandates that ITT, in order to free itself of future reverse-seniority obligations, would be required to give a wage increase, a one-time bonus, or some other new benefit to the employees with the explicit understanding that such benefit was given in exchange for the amendment to the policy manual. This becomes artificial because it is foreign to the unilateral at-will relationship and, as a practical matter, it leaves the employer unable, at least in part, to manage its business. I disagree with the proposition that "new" consideration is necessary.
¶ 66 The majority further asserts that ITT's exercise of the unilateral right to amend the handbook renders the employer's original reverse-seniority promise illusory. Once again, I disagree. An illusory promise is one which by its own terms makes performance optional with the promisor whatever may happen, or whatever course of conduct he may pursue. 17A Am.Jur.2d Contracts § 3 at 27 (1991). The reverse-seniority promise was not illusory because it was not optional with ITT as long as it remained a part of ITT's handbook policy. During the years of its existence, it was fully enforceable. Moreover, the promise was genuine because it was applicable to all ITT employees, not merely a select few. Leikvold, 141 Ariz. at 548, 688 P.2d at 174.
¶ 67 The same notion applies, of course, to any promise given in a unilateral relationship. It remains in full force until it is withdrawn or amended. If the ITT promise of reverse-seniority were illusory, so also would every unilateral promise become illusory on the basis that such promise could be withdrawn or amended.
¶ 68 The majority opinion produces the net result that the reverse-seniority layoff policy, as a permanent term of the "employment contract" with respect to any employee who at any time worked under it, gains parity with a negotiated collective bargaining agreement having a definite term, usually three years. In fact, the ITT policy would have force and effect even greater than a collective agreement because its existence, as to the Demasse plaintiffs and others similarly situated, becomes perpetual. This result grants preferential treatment to every employee who worked under the policy but denies such treatment to employees hired after its removal. A collective bargaining agreement is bilateral, and to impose a bilateral relationship on simple at-will employment is, in my view, an attempt to place a square peg in a round hole. Inevitably, this will impair essential managerial flexibility in the workplace. It will also cause undue deterioration of traditional at-will principles.
¶ 69 Two decisions cited by the Ninth Circuit in the certification order, both from Arizona, appropriately apply the foregoing principles. In Chambers v. Valley National Bank, 721 F.Supp. 1128 (D.Ariz.1988), an employee, terminated without cause after sixteen years of employment, alleged breach of contract by the defendant bank. The manual in effect at the time of termination defined plaintiff's employment as "at-will." The employee argued that the bank was barred from unilaterally changing a policy of "for cause" termination because the at-will disclaimer did not appear in previous versions of the employment handbook. The court disagreed:
The inclusion of the disclaimer in the 1985 publications may best be considered an offer of a modification to a unilateral contract of employment, which plaintiff accepted by continuing her employment with defendant. Although an "employer is contractually bound to observe ... [published] policies until they are modified *1157 or withdrawn," he is free to modify his personnel policies prospectively.
Chambers, 721 F.Supp. at 1131-32 (emphasis added).
¶ 70 Similarly, Bedow v. Valley National Bank, 5 IER Cases 1678 (D.Ariz.1988), holds:
[A]s a matter of basic contract law, each successive version of defendant's personnel policy manual modifies and supersedes prior issued versions. Courts in other jurisdictions have specifically so held, while courts in Arizona have implicitly done so as in Mattison v. Johnston, 152 Ariz. 109, 730 P.2d 286 (App.1986) where the court ruled that continued employment constituted sufficient consideration to enforce a new term or provision of employment in an "at will" employment relationship.
Bedow, 5 IER Cases at 1680 (emphasis added).
¶ 71 Leikvold itself is not to the contrary.
[P]ersonnel manuals can become part of employment contracts. Whether any particular personnel manual modifies any particular employment-at-will relationship and becomes part of the particular employment contract is a question of fact.
Leikvold, 141 Ariz. at 548, 688 P.2d at 174. These cases identify the at-will relationship as contractual and hold that a handbook is subject to unilateral change and can thus modify that relationship. Conversely, the majority roots its analysis in the erroneous notion that a single contract termlayoff by reverse-senioritysupplants the at-will relationship when in fact the removal of one term of that relationship is all that was intended. Neither Leikvold, Wagner, nor Wagenseller supports such a departure from established law.
¶ 72 Courts have adopted various legal theories upholding the at-will relationship in a similar context. Some have theorized that distribution of an amended employee handbook constitutes an offer "to replace" the existing contract with a new contract. In Lee v. Sperry Corp., 678 F.Supp. 1415 (D.Minn.1987), a Minnesota district court applied Pine River principles and concluded that distribution of a new handbook negated the existence of a former implied contractual layoff term:
"[A]n original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." Although Pine River dealt directly with the transformation from at-will employment to employment based on unilateral contract, the principle seems equally applicable to the opposite transformation. Here, plaintiff worked for over three years after receiving the handbook with the employment contract disclaimer. During that time, he was provided with salary increases and other improvements in employment benefits.
Id. at 1418 (quoting Pine River, 333 N.W.2d at 627) (emphasis added). The majority opinion in the instant case ignores Pine River's "replacement of contract" language, cited in Lee, though this court cited Pine River approvingly in Wagenseller. See Wagenseller, 147 Ariz. at 381, 710 P.2d at 1036; see also Restatement (Second) of Contracts § 279 & cmt. a (1981) ("A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it. A common type of substituted contract is one that contains a term that is inconsistent with a term of an earlier contract between the parties.").
¶ 73 Moreover, failure to include in a first-distributed handbook a provision reserving the power to modify or amend does not alter the analysis. See Ferrera v. A.C. Nielsen, 799 P.2d 458, 460 (Colo.App.Ct.1990); Bankey, 443 N.W.2d at 120 ("[w]e hold today that an employer may make changes in a written [handbook] policy applicable to its entire workforce or to specific classifications without having reserved in advance the right to do so.").
¶ 74 Other courts have upheld the employer's right to amend by express rejection of strict rules of contract modification. The Michigan Supreme Court adopted this theory, answering a certified question strikingly similar to the question presented here and *1158 concluding that an employer must have unilateral ability to amend handbook provisions:
In a typical situation, where employment is for an indefinite duration, the unilateral contract framework provides no answer to the question: When will the act bargained for by the employer be fully performed? The answer to that question depends on the characterization of the "act" for which the promise is exchanged. If the "act" is simply a day's work (for a day's wage), then ... [t]he employer's offer is renewed each day, and each day's performance by the employee constitutes a new acceptance and a new consideration. But such a characterization can be strikingly artificial. Few employers and employees begin each day contemplating whether to renew or modify the employment contract in effect at the close of work on the previous day.
....
The major difficulty [with the idea that a "meeting of the minds" must occur to alter an implied in fact contract] as applied to the question before us is that the contractual obligation which may not be modified without mutual assent ... could have arisen without mutual assent.... Under circumstances where "contractual rights" have arisen outside the operation of normal contract principles, the application of strict rules of contractual modification may not be appropriate.
Bankey, 432 Mich. 438, 443 N.W.2d 112, 116 (1989) (emphasis added).
¶ 75 One commentator refers to the Bankey approach as an "administrative law model":
The employer, like an agency, is bound by its rules, but always remains free to change the rules prospectively through proper procedures. Agencies have wide discretion in amending or revoking their regulations, as long as they meet the requirements set by administrative law for issuing them in the first place. But until modified or revoked, the regulations must be followed by the issuing agency. This is a good model for implied-in-fact contracts of employment security....
The general idea is well accepted in other areas of labor and employment law. Henry H. Perritt, Jr., Employee Dismissal Law & Practice § 4.44 (3d ed.1992) (citations omitted).
¶ 76 In the case at bar, the majority applies the hypertechnical approach rejected by the Bankey court. Yet, the concept of prior notice, central to the Bankey model, was stated in Dover Copper Mining Co. v. Doenges, 40 Ariz. 349, 357, 12 P.2d 288, 291-92 (1932) (finding employment at-will service contracts "are terminable at pleasure by either party, or at most upon reasonable notice"). Consistent with Dover, this court stated in Leikvold that the at-will rule "is at best a rule of construction." See Leikvold, 141 Ariz. at 547, 688 P.2d at 173.
¶ 77 Principles of equity and pragmatic reason have also governed the employer's unilateral right to change an implied-in-fact term in a handbook. The federal district court, applying Arizona law in Bedow, correctly asserted that the last-distributed handbook controls employment conditions and trumps prior inconsistent handbook terms:
Any other conclusion would create chaos for employers who would have different contracts of employment for different employees depending upon the particular personnel manual in force when the employee was hired. Such a result would effectively discourage employers from either issuing employment manuals or subsequently upgrading or modifying personnel policies.
Bedow, 5 IER Cases at 1680 (emphasis added).
¶ 78 Michigan's Bankey decision cited similar concerns:
Were we to ... hold[ ] that once an employer adopted a policy of discharge-for-cause, such a policy could never be changed short of successful renegotiation with each employee who worked while the policy was in effect, the uniformity stressed in Toussaint would be sacrificed. ... If an employer had amended its handbook from time to time, as often is the case, the employer could find itself obligated in a variety of different ways to any number of different employees, depending on the modifications which had been adopted and the extent of the work *1159 force turnover. Furthermore, ... many employers would be tied to anachronistic policies in perpetuity merely because they did not have the foresight to anticipate the Court's Toussaint decision by expressly reserving at the outset the right to make policy changes.
Bankey, 443 N.W.2d at 119-20 (emphasis added). See Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257, 1266 n. 8 (1985) (a variety of unforeseen business and economic conditions that can and do arise, require the ability to adapt to prospective needs). See also Fleming v. Borden, Inc., 316 S.C. 452, 450 S.E.2d 589, 595 (1994) ("[T]he employer-employee relationship is not static. Employers must have a mechanism which allows them to alter the employee handbook to meet the changing needs of both business and employees."); Brooks v. Trans World Airlines, Inc., 574 F.Supp. 805, 810 (D.Colo.1983) ("TWA's concern that it not be shackled with a workforce it is unable to reduce without fear of wrongful discharge litigation is understandable...."); Ferrera, 799 P.2d at 460 ("It would be unreasonable to think that an employer intended to be permanently bound by promises in a handbook, leaving it unable to respond flexibly to changing conditions."). Although the rationales have differed among these opinions, a common theme emergesrecognition that an employer cannot be perpetually bound by a handbook promise for which the employees did not specifically bargain at the outset of the relationship.[2]
¶ 79 In addition to the error of contract construction, the majority applies inapposite authority to bolster the most critical aspect of its reasoning. The opinion cites extensively to Toth v. Square D Co., 712 F.Supp. 1231 (D.S.C.1989), a federal case applying South Carolina law. Yet the Supreme Court of South Carolina squarely rejected Toth by allowing unilateral change in an employment manual subject to reasonable notice by the employer to the employees. See Fleming v. Borden, Inc., 316 S.C. 452, 450 S.E.2d 589, 595 (1994) ("[W]e reject the bilateral concepts enunciated in Toth.") (emphasis added).[3]
¶ 80 Thompson v. Kings Entertainment Co., 674 F.Supp. 1194 (E.D.Va.1987), also cited by the majority and referring to Virginia law, is rejected by the decision in Progress Printing Co., Inc. v. Nichols, 244 Va. 337, 421 S.E.2d 428 (1992), where the Supreme Court of Virginia held that an acknowledgment, signed by an employee, superseded and replaced a provision in an employee handbook that an employee could be discharged only "for cause."[4]
¶ 81 Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 662 A.2d 89 (1995) is also inapposite. The Torosyan court noted that representations were made specifically to a particular employee during *1160 the job interview that established at the outset a required move from California to Connecticut and an employment relationship whereby the employee could be terminated only for cause. The court understandably refused to allow the employer to modify such terms through general dissemination of an employee handbook. These terms were specific to the employee in question and not part of the terms of employment applicable to employees generally. The opposite is true in the instant case.
¶ 82 Finally, the majority cites to Yeazell v. Copins, 98 Ariz. 109, 402 P.2d 541 (1965), as principal proof that its opinion "blazes no new ground."[5] Contrary to our facts, Yeazell addressed the legislature's ability to alter vested pension terms after employment had begun. That issue is vastly different from the one presented here. In Yeazell, we held that legal vesting of such rights occurs at the time employment begins. See id. at 115, 402 P.2d at 545. In contrast, the Ninth Circuit observed in the instant case that "nothing in Arizona law ... would treat rights to layoff in a certain order as a vested benefit." See Demasse v. ITT Corp., 111 F.3d 730, 733 (9th Cir.1997). Vested rights present a fundamentally different issue. See Bankey, 443 N.W.2d at 120 n. 17 (noting that a unilateral change of vested rights involves a different analysis than when only nonvested "rights" are at issue).[6]
¶ 83 The majority's answer to the certified question will frustrate the legitimate expectations of both employers and employees. The notion that one term in an employee handbooka reverse-seniority layoff term can be perpetually binding as to some but not all employees will effectively undermine Wagner, Wagenseller, and Leikvold on which employers have relied for years. The opinion unduly punishes ITT and other employers similarly situated. We said in Leikvold that employers should place contract disclaimer language in their handbooks to preserve the at-will relationship. ITT responded by inserting such language. We should leave it at that.
MARTONE, Justice, dissenting in part and concurring in part.
¶ 84 I disagree with the majority's answer to certified question No. 1.[1] The handbook promise here cannot reasonably be construed as a promise that runs in favor of the employee for as long as the employee is employed or else the unilateral promise turns *1161 out to be a better deal than a collective bargaining agreement. Indeed, it becomes the functional equivalent of good behavior tenure under Article III of the United States Constitution. That the employer could avoid this result by simply laying everyone off (and thus not violate the seniority provision) shows just how untenable the majority approach is. Instead, I believe that the Michigan Supreme Court was correct in concluding that the promise is enforceable against the employer by an individual employee, unless and until the employer changes the promise as to all employees by changing the handbook. See In re Certified Question (Bankey), 432 Mich.438, 443 N.W.2d 112, 121 (1989) ("An employer may ... unilaterally change a written discharge-for-cause policy to an employment-at-will policy even though the right to make such a change was not expressly reserved from the outset.").
¶ 85 This does not make the promise illusory. An employer would have to think long and hard about changing a valuable benefit for 10,000 employees just to disadvantage a single employee. And, unless the employer is willing to pay that price, the employee can enforce the promise against the employer, as in Leikvold v. Valley View Community Hospital, 141 Ariz. 544, 688 P.2d 170 (1984), and Wagenseller v. Scottsdale Memorial Hospital, 147 Ariz. 370, 710 P.2d 1025 (1985), where the handbook provisions had not been revoked before they were sought to be enforced. Similarly, the promise here was not to provide seniority rights to Demasse for as long as he decided to work for ITT, but was instead a promise to provide seniority rights to him as an individual employee so long as all other ITT employees were also receiving this benefit under the handbook. Demasse's power of acceptance by performance existed only as long as the offer was made.
¶ 86 Today's decision goes far beyond Leikvold and Wagenseller. Both employers and employees will suffer from it. It will create havoc with employer-employee relations. For example, employers will be subject to different obligations to their many employees depending on the handbook in existence at the time of employment. And, one employee's contract rights may be derived from several different editions of the handbook. Worse, the contract rights of some employees created by one edition of the handbook may conflict with rights provided other employees in other editions. This spells the demise of all such handbooks. No employer will ever issue one for fear of endless obligation, and thus the employee benefit of Leikvold will be lost to future generations of employees.
¶ 87 I respectfully dissent.
NOTES
[1] ITT apparently conceded this in district court. See Demasse v. ITT Corp., 915 F.Supp. 1040, 1043 (D.Ariz.1995) (noting that "[d]efendants do not dispute that these pre-1989 handbooks create a contract term requiring layoffs to be made according to seniority").
[2] ITT cited Chambers, 721 F.Supp. 1128, Bedow v. Valley National Bank, 5 IER Cases 1678, 1988 WL 360517 (D.Ariz.1988), and Duncan v. St. Joseph's Hospital & Medical Center, 183 Ariz. 349, 903 P.2d 1107 (1995), for support. Demasse, 111 F.3d at 733.
[3] In the unilateral or at-will context, once the offer is accepted by commencement of performance, the terms cannot be changed. RESTATEMENT (SECOND) OF CONTRACTS § 45. Thus, if an employer offers a day's pay for a day's work, the employer cannot, after employee performance, reduce the offer of pay that induced the performance.
[4] Dissenting, Justice Jones argues that in Fleming and Progress Printing, the South Carolina and Virginia Supreme Courts rejected the Toth and Thompson approaches. Dissent at ¶¶ 79-80. We do not agree. In Fleming, the South Carolina court refused to follow either Toth or the view advanced by ITT, which would recognize a right of unilateral modification. Instead, the Fleming court held that when the employer has provided employees with actual notice of a modification, continued work will evidence assent to that modification, but the question of actual notice and assent will be for the jury. 450 S.E.2d at 595-96. Progress Printing considered which of two documents given to a probationary employee thirteen days apart, if not both, governed the terms of his employment from the outset. 421 S.E.2d at 430-31. Nowhere in Progress Printing did the court refer to or diminish Thompson. For the reasons stated in ¶ 23, we disagree with the approach taken by Fleming and believe Progress Printing is not on point with the issues presented in this case.
[5] See, e.g., Pine River State Bank, 333 N.W.2d at 627; Hogue v. Cecil I. Walker Mach. Co., 189 W.Va. 348, 431 S.E.2d 687, 691 (1993).
[6] Unless otherwise indicated, reference to a single dissent is to the dissent by Vice Chief Justice Jones.
[7] 432 Mich. 438, 443 N.W.2d 112 (1989).
[1] Courts are virtually universal in accepting the precept that an employer is entitled, unilaterally, to modify handbook terms. See, e.g., Ryan v. Dan's Food Stores, Inc., 972 P.2d 395, 401 (Utah 1998) (continued work with knowledge of changed employment conditions renders previous, contradictory handbook provisions inapplicable); Johnston v. Panhandle Coop. Ass'n, 225 Neb. 732, 408 N.W.2d 261, 266 (1987) ("[W]here an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer."); Cook v. Heck's Inc., 176 W.Va. 368, 342 S.E.2d 453, 459 (1986) ("We agree with those courts that have found valuable consideration in the continued labor of workers who have in the past foregone their right to quit at any time. We conclude that a promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable."); see also Thomas G. Fischer, Annotation, Sufficiency of Notice of Modification in Terms of Compensation of At-Will Employee Who Continues Performance to Bind Employee, 69 A.L.R.4th 1145 (1989).
[2] In contrast, the majority effectively holds that once the at-will relationship is modified and supplanted by an implied-in-fact contract term, that term becomes a permanent obligation, no longer subject to change by unilateral notice and acceptance manifested by continued work on the part of the work force. The majority would require a fully negotiated elimination of the implied-in-fact term with each employee, supported by new consideration flowing to each employee. In support, the majority cites case law from Wyoming and Illinois. See Brodie v. General Chemical Corp., 934 P.2d 1263 (Wyo.1997); Doyle v. Holy Cross Hosp., 186 Ill.2d 104, 237 Ill.Dec. 100, 708 N.E.2d 1140 (1999); and Robinson v. McKinley Comm. Serv. Inc., 19 F.3d 359 (7th Cir.1994). Quite clearly, these cases support the majority position in the instant case. But they reflect no more than a minuscule minority in a vast sea of cases and traditional law to the contrary. I believe they are wrongly decided.
[3] The Fleming decision also moots the majority's reference to Bishop Realty & Rentals, Inc. v. Perk, Inc., 292 S.C. 182, 355 S.E.2d 298 (App.1987), a decision of South Carolina's appellate court that preceded Fleming.
[4] The majority argues that Progress Printing is "not on point," asserting that the court analyzed two conflicting documents as a single contract. I believe the majority reads the case incorrectly. The trial court treated two documents, a handbook and a later-issued acknowledgment form, as one contract en route to concluding that the handbook promise of written notice before termination was still in force. On appeal, the Supreme Court of Virginia found the two documents in conflict, and thus not part of the same contract. The court ruled the later-issued acknowledgment erased the promise of written notice found in the handbook, reversing the trial court's legal holding and its underlying factual conclusion that the two documents were part of one contract. This result cannot be reconciled with Thompson, a federal diversity case purporting to apply Virginia law.
[5] Three other cases cited to support the "no ground-blazing" argumentAngus Med. Co. v. Digital Equip. Corp., 173 Ariz. 159, 840 P.2d 1024 (App.1992); Nationwide Resources Corp. v. Massabni, 134 Ariz. 557, 658 P.2d 210 (App. 1982); Coronado Co., Inc. v. Jacome's Dep't Store, Inc., 129 Ariz. 137, 629 P.2d 553 (App.1981)do not deal with at-will employment but instead deal with modification of bilateral executory contracts, a form of contractual relationship which does not exist in the instant case by reason of the indefinite duration of employment and the employees' right to quit at any time.
[6] Even in the higher stakes realm of vested rights under pension plans, two recent federal circuit courts have rejected the bilateral concepts espoused in our majority opinion. See Sprague v. General Motors Corp., 133 F.3d 388 (6th Cir. 1998) (rejecting the argument that GM's handbook created a bilateral contract, which could not be unilaterally modified, that would force GM to pay medical benefits to employees after retirement); Frahm v. The Equitable Life Assurance Soc'y, 137 F.3d 955 (7th Cir.1998) (rejecting bilateral contract arguments and allowing unilateral change in employee medical plan benefits). Those decisions produced a harsher result than that faced by the Demasse plaintiffs.
[1] I agree with the court's resolution of certified question No. 2. I also note that the court is not following the procedure recommended in Hazine v. Montgomery Elevator Co., 176 Ariz. 340, 344-45, 861 P.2d 625, 629-30 (1993). There, the court recommended that when confronted with a 3-2 or 2-2 split by this court when it is in transition, it is the better practice to reargue the case before the new court. Hazine cited the procedure used in State v. Youngblood, 173 Ariz. 502, 844 P.2d 1152 (1993), as an example of how the court "has rescheduled oral arguments after a new member of the court has been seated" and commended the Youngblood practice to our successors. Hazine at 345, 861 P.2d at 630. Contrary to the court's assertion, ante, at ¶ 42, the Hazine recommendation was not limited to the Bryant setting. Picking up where the court left off, id., here is what Hazine said:

In the recent past, this court has, at times, when confronted with a 2-2 split by permanent members of the court, declined to render a decision, see State ex rel. McDougall v. Martone, 174 Ariz. 343, 849 P.2d 1373 (1993) (one Justice had recused himself), or has rescheduled oral arguments after a new member of the court has been seated, see State v. Youngblood, CR-90-0053-PR (order dated April 3, 1992). We have done this in an attempt to avoid the confusion in other areas of the law similar to that engendered by Bryant in interpreting art. 18, § 6. See Church, 173 Ariz. at 346, 842 P.2d at 1359 (`Since the composition of the court changed between the time that Humana Hospital [Desert Valley v. Superior Court, 154 Ariz. 396, 742 P.2d 1382 (1987)] and Bryant were decided, and has changed against since Bryant, this question may still be an open one.'). The procedure followed in McDougall and Youngblood is the better practice in those rare instances where the court is divided and in transition. On important issues that tend to recur, we will follow such procedures when feasible. We commend it to our successors as well.
176 Ariz. at 345, 861 P.2d at 630.
My own view is that the choice of approach when the court is divided is not as important as the consistent application of any approach. I take the court's refusal to follow the Hazine recommendation as a rejection of Hazine's challenge to the validity of this court's opinions based upon who decides them and with that I heartily concur.