IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

EVA CORNELL,
*Plaintiff,*

*v.*

DESERT FINANCIAL CREDIT UNION, ET AL.
*Defendants.*

No. CV-22-0071-CQ
Filed March 2, 2023

Certified Questions from the United States District Court of Arizona
The Honorable Dominic W. Lanza, Judge
No. CV-21-00835-PHX-DWL
**QUESTION ANSWERED**

COUNSEL:

Cindy C. Albracht-Crogan, Kaysey L. Fung, Cohen Dowd Quigley, Phoenix; and Steven A. Haskins (argued), Richard D. McCune, David C. Wright, Emily J. Kirk, McCune Law Group, ACP, Ontario, CA, Attorneys for Eva Cornell

Brian A. Cabianca (argued), David S. Norris, Lukas M. Landolt, Kaitlyn R. Hertzog, Squire Patton Boggs (US) LLP, Phoenix, Attorneys for Desert Financial Federal Credit Union

Karl M. Tilleman, Jason Sanders, Douglas D. Janicik, Dentons US LLP, Phoenix, Attorneys for Amici Curiae Chamber of Commerce of the United States of America and Arizona Chamber of Commerce and Industry

JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, JUSTICES BOLICK, BEENE, MONTGOMERY, and KING joined.

_____

JUSTICE LOPEZ, Opinion of the Court:

¶1 The United States District Court for the District of Arizona certified two questions for our review: (1) Does an effective modification of a consumer contract occur when the offeror sends notice of the proposed modification to the offeree, through a communication channel to which the offeree previously consented, even if the offeree fails to respond?; and (2) If not, what additional showings (such as actual receipt of the notice of proposed modification, subjective understanding of the proposed modification, or affirmative consent to the proposed modification) are necessary to achieve an effective contract modification in this circumstance?

¶2 We hold that on-going, at-will, consumer-business relationships consist of the day-to-day offer and acceptance of unilateral contracts; thus, businesses may effectively modify the non-negotiated, standardized terms governing these relationships if the business demonstrates that (1) the contract's initial terms expressly notified the consumer that the business could make future changes to the terms; (2) the business gave—and the consumer received—reasonable notice of the modification and an opportunity to opt out with no change to the status quo business relationship; and (3) the consumer continued the business relationship past a reasonable opt-out period. In so holding, we adopt the Restatement of Consumer Contracts § 3 (Am. L. Inst., Tentative Draft No. 2, 2022) ("Restatement § 3") to the extent our previous holding in *Darner Motor Sales v. Universal Underwriters Insurance Co.*, 140 Ariz. 383 (1984), does not provide for this result. Our answer to the first question in the affirmative obviates the need to address the second question.

## BACKGROUND

¶3 In October 2018, as a part of opening checking and savings accounts with Desert Financial, Eva Cornell agreed to certain terms and conditions (the "Terms"). These stated that Desert Financial could "change those terms and conditions from time to time." Cornell also "consented to the electronic delivery of all future communications from Desert Financial, including all disclosures, notices, and account statements." At that time, the Terms did not contain an arbitration clause.

¶4 When Cornell agreed to the Terms, she was subjectively unaware of the absence or presence of an arbitration clause. In a later

2

deposition, she testified that even had the Terms originally included an arbitration clause, and she knew of the clause, she would have still agreed to the Terms.

**¶5**  In February 2021, Desert Financial updated its Terms, adding a mandatory arbitration clause. The clause appeared on page five of a fourteen-page document and began as follows: "**DISPUTE RESOLUTION: MANDATORY ARBITRATION. READ THIS PROVISION CAREFULLY AS IT WILL HAVE A SUBSTANTIAL IMPACT ON HOW LEGAL CLAIMS YOU AND THE CREDIT UNION HAVE AGAINST EACH OTHER WILL BE RESOLVED.**" The following text explained that "[a]rbitration is not a mandatory condition of you maintaining an account with Credit Union" and that "YOU MAY OPT OUT of this arbitration provision so long as the Credit Union receives notice of your desire to opt-out by April 30, 2021 or 30 days after you open your account, whichever is later." The clause also explained how to opt out.

**¶6**  Desert Financial did not directly contact its account holders concerning its updated Terms. Rather, it posted on monthly account statements a contrasting orange-and-blue banner stating in large block lettering: "Change-in-Terms." In much smaller font, the banner informed readers that the changes concerned "how we will resolve legal disputes related to your accounts." At the banner's bottom, it directed readers to view the complete and updated version of the Terms by clicking on a provided URL written in bold font typical to hyperlinks.

**¶7**  Because Cornell opted for electronic communications, she did not receive account statements in the mail. On March 23, 2021, Desert Financial notified her that her March account statement was available for online viewing. The "Change-in-Terms" banner appeared on the statement, which she could access any time she signed into her account.

**¶8**  On April 13, 2021, in conjunction with her efforts to buy a car, Cornell used Desert Financial's mobile app to download a PDF of her monthly account statement for March 2021. During the downloading process, she saw the "Change-in-Terms" banner appearing on the statement. Later, when she was unable to locate her downloaded PDF, she again saw the banner when she obtained an electronic copy of the March 2021 statement from Desert Financial via DocuSign. Ultimately, she never clicked the banner's URL, viewed the updated Terms, or took the prescribed steps for affirmatively opting out of the arbitration clause.

3

¶9 On May 5, 2021, Cornell filed a class action suit in the District of Arizona, alleging "ambiguous and misleading language" concerning overdraft fees in violation of federal law. In response, Desert Financial moved to compel arbitration, arguing that the February 2021 arbitration clause became part of its Terms binding on Cornell. Cornell argued that she never assented to the updated Terms; thus, the arbitration clause was never incorporated into her agreement with Desert Financial.

¶10 On October 8, 2021, the district court ordered supplemental briefing on whether Cornell's continued patronage following Desert Financial's amendment and notice via the orange-and-blue banner constitutes "a valid contract modification under Arizona law." Following a hearing and review of the parties' briefing, on March 11, 2022, the district court certified to this Court two questions concerning contract modification. Because Arizona law is unclear concerning the requirements for unilateral modification of standard consumer contracts, we agreed to provide clarification pursuant to our jurisdiction under article 6, section 5(6) of the Arizona Constitution and A.R.S. § 12-1861.

## DISCUSSION

¶11 In considering the requirements for modifying the terms of at-will, on-going, business-consumer relationships, we conclude that our jurisprudence does not provide definitive guidance. To fill this void, we adopt Restatement § 3 because it is consistent with Arizona contract law and sets forth sound public policy.

## I.

## A.

¶12 We begin with fundamental Arizona contract law, which distinguishes between bilateral contracts and unilateral contracts. *Knack v. Indus. Comm'n*, 108 Ariz. 545, 548 (1972). Bilateral contracts consist of an exchange of promises. *Id.*; *Wagner v. City of Globe*, 150 Ariz. 82, 85 (1986) ("[B]ilateral contract[s] . . . require mutuality of obligation . . . ."). Once a bilateral contract is formed, its terms cannot be modified absent an additional offer, acceptance, and consideration. *Demasse v. ITT Corp.*, 194 Ariz. 500, 506 ¶ 18 (1999).

¶13 In contrast, unilateral contracts are formed upon the offeree's acceptance by performance. *Id.* at 515 ¶ 53 (Jones, V.C.J., concurring in part

and dissenting in part) (describing unilateral contracts as the "performance of an act in exchange for a promise to pay"). Before performance is rendered, the doctrine of contract modification does not apply to *offers* of unilateral contracts because there is no contract to modify, as shown in the at-will employment context:

> At-will employment contracts are unilateral and typically start with an employer's offer of a wage in exchange for work performed; subsequent performance by the employee provides consideration to create the contract. Thus, before performance is rendered, the offer can be modified by the employer's unilateral withdrawal of the old offer and substitution of a new one: the employer makes a new offer with different terms and the employee again accepts the new offer by performance (such as continued employment). Thus a new unilateral contract is formed — a day's work for a day's wages.

*Id.* at 504–05 ¶ 12 (internal citations omitted). In this scenario, the next day's unilateral contract offer's terms may be changed at any time before performance. *Id.*; *accord Wagner*, 150 Ariz. at 85–86; *see also Johnson v. Associated Milk Producers, Inc.*, 886 N.W.2d 384, 392 (Iowa 2016) ("In an at-will contract, a party who gives notice of a changed term effectively offers a new contract in place of the existing one, which the other party may accept by continued performance.").

¶14        Applying this at-will contract modification doctrine, the Alabama Supreme Court held that at-will bank patrons "implicitly assented to be bound by [new] arbitration provisions by holding open their accounts after notice of the amendment." *SouthTrust Bank v. Williams*, 775 So. 2d 184, 191 (Ala. 2000). The court reasoned that "[a]mendments to the conditions of unilateral-contract relationships with notice of the changed conditions are not inconsistent with the general law of contracts." *Id.* at 190–91.

¶15        Conversely, a bilateral employment contract's terms may only be modified with an offer, acceptance, and consideration. *Demasse*, 194 Ariz. at 506 ¶ 18. In proving acceptance, the employer carries the burden to show that the employee (1) received "legally adequate notice," which is "more than the employee's awareness of or receipt of the newest [employee] handbook," *id.* at 508 ¶ 24; and (2) "assented with knowledge of the attempted modification and understanding of its impact on the underlying contract," *id.* ¶ 23.

**¶16**　　　　In *Demasse*, this Court answered a certified question concerning employment contract modification. *Id.* at 502 ¶ 2. The initial terms of the case's particular contract did not expressly allow unilateral changes to the terms, *id.* at 503 ¶¶ 4, 6, and for purposes of answering the certified question, we assumed that the contract was bilateral. *Id.* ¶ 5 n.1. Accordingly, we treated the inclusion of a reverse-seniority layoff provision to the contract as creating an implied-in-fact, bilateral, contractual term. *Id.* at 503 ¶ 5, 504 ¶ 11. We reasoned that, by creating job security, the provision "substantively govern[ed] the employee's job and employment expectations"; thus, "'the employer should reasonably have expected the employee to consider [the provision] as a commitment from the employer,'" as required for implied-in-fact employment contracts. *Id.* at 505 ¶ 16 (quoting *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 621 (Colo. App. 1997)). Ultimately, we found ineffective the employer's unilateral attempt to modify the bilateral contract's reverse-seniority layoff term. *Id.* at 507 ¶ 21, 508 ¶¶ 24–25.

**¶17**　　　　Cornell cites federal court rulings,[1] arguing that *Demasse*'s stringent modification rule applies to her and Desert Financial's at-will banking deposit agreement. We disagree. Cornell and Desert Financial's business relationship consists of day-to-day unilateral contract offers and acceptances. Like the at-will bank patrons in *SouthTrust Bank*, Cornell was free to terminate her accounts with Desert Financial at any time and vice versa. This materially differs from *Demasse*, where we considered the

---

[1] *Rose v. Humana Ins. Co.*, No. CV-17-08107-PCT-DGC, 2018 WL 888982, at *3 (D. Ariz. Feb. 14, 2018) (holding that an insurer's email failed to modify an agreement because "even if . . . [the insurer's] evidence of sending the email is accepted as true . . . [i]t does not show that [the insured] read . . . [or] understood the email and assented to the arbitration agreement it contained"); *Vantage Mobility Int'l LLC v. Kersey Mobility LLC*, No. CV-19-04684-PHX-JJT, 2021 WL 1610229, at *15–16 (D. Ariz. Apr. 26, 2021) (holding that a car dealer's continued business with a supplier did not amount to acceptance of the supplier's e-mailed offer to modify their existing agreement where the original agreement contained no unilateral modification clause, reasoning that "the daily business of sales did not implicate the terms of [the proposed modification]," and "[the supplier] produced no evidence that . . . gave [the dealer] reason to understand that [the dealer's] assent could be manifested as silence or inaction").

modification of a *bilateral* employment contract whose original terms did not expressly provide for unilateral modification. *Demasse* does not articulate the applicable rule for altering the terms of at-will, on-going, consumer-business relationships. 194 Ariz. at 504 ¶ 11 (describing the difference between at-will agreements and bilateral agreements as "dispositive with regard to methods necessary for modification"); *Taleb v. AutoNation USA Corp.*, No. CV-06-02013-PHX-NVW, 2006 WL 3716922, at *5 (D. Ariz. Nov. 13, 2006) ("The holding of the Arizona Supreme Court in [*Demasse*] is limited to situations in which an employer attempts to unilaterally modify a contract that creates an expectation of job security . . . .").

**B.**

¶18    Of our precedents, our decision in *Darner* comes closest to stating the applicable rule. In *Darner*, we held that courts may construe standardized agreements to reflect oral assurances made during negotiations even where the contract's unambiguous, boiler plate language directly conflicts with the assurances. 140 Ariz. at 395–96. We reasoned that although standardized contracts are integral to sustaining the sheer volume of daily transactions in modern society, customers entering standardized agreements do not often read or fully digest them, *id.* at 393–94; thus, customers "are not bound to unknown terms which are beyond the range of reasonable expectation," *id.* at 391 (quoting Restatement (Second) of Contracts § 211 cmt. f (Am. L. Inst. 1981)).

¶19    In so holding, we adopted the Restatement (Second) § 211, which recognizes that a term is unenforceable if "the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term." *Id.* at 391 (quoting Restatement (Second) § 211). We further embraced Restatement (Second) § 211's guidance concerning indicia of unenforceability of contract modifications:

> Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy

against unconscionable terms and the rule of interpretation against the draftsman.

*Id.* at 392 (quoting Restatement (Second) § 211 cmt. f).

**¶20** Synthesizing unilateral contract law with *Darner*, an at-will consumer's continued patronage (i.e., performance of the next day's unilateral contract) constitutes valid acceptance of the business's new terms if the consumer knew of the new terms when performing, *see Demasse*, 194 Ariz. at 504–05 ¶ 12, but the consumer cannot be bound by "unknown terms . . . beyond the range of reasonable expectation, " *Darner*, 140 Ariz. at 391 (quoting Restatement (Second) § 211 cmt. f). For example, for the Terms to be enforceable against Cornell, Desert Financial objectively must have had no reason to believe that she would not have accepted the Terms "if [she] knew that the writing contained a particular term." *Id.* (quoting Restatement (Second) § 211).

**¶21** Although this standard establishes the proper analytical framework, it fails to resolve whether enforceability requires the consumer's actual knowledge of new terms, an issue that has divided courts. *Compare Cap. One Bank v. Davey*, No. 1 CA-CV 13-0109, 2013 WL 6729261, at *5 ¶ 20 (Ariz. App. Dec. 19, 2013) (mem. decision) ("An offer cannot be accepted unless the offeree *actually knows* of the offer's existence." (emphasis added)), *with Hagin v. Fireman's Fund Ins. Co.*, 88 Ariz. 158, 162 (1960) (holding that an insurance company effectively modified an implied contract term permitting late payments by mailing notice to its customer because "where all that [the insured] had to do was to open their mail, they are charged with constructive notice"). *Darner* provides no insight because it obviated the issue by effectively modifying the parol evidence rule. *See* 140 Ariz. at 391 (describing its adoption of the Restatement (Second) § 211 as "basically a modification of the parol evidence rule when dealing with contracts containing boiler-plate provisions which are not negotiated, and often not even read by the parties").

**¶22** This framework also fails to address whether additional consumer protections are necessary in this context, such as (1) requiring express notice that the business may unilaterally modify terms and that the consumer's failure to opt out constitutes acceptance, *cf. SouthTrust Bank*, 775 So. 2d at 185 (observing that initial terms contained an express change-in-terms clause); and (2) ensuring the consumer's ability to opt out of proposed modifications without penalty, i.e., to reject a proposed

modification and maintain the status quo business relationship.[2]  *See* Restatement § 3(a)(2).  Consequently, we are tasked with filling this gap in the common law.

## II.

**¶23**        In the absence of binding precedent, we follow the Restatement if it sets forth sound legal policy.  *See In re Sky Harbor Hotel Props., LLC*, 246 Ariz. 531, 533 ¶ 6 (2019).  Notably, we have followed the Restatement of Contracts in interpreting and enforcing standardized contracts.  *See Darner*, 140 Ariz. at 391.  We also have followed draft statements.  *See, e.g.*, *Sullivan v. Pulte Home Corp.*, 232 Ariz. 344, 346 ¶ 10 (2013) (illustrating the Court aligning its opinion "with the most recent draft of the Restatement" (citing Restatement (Third) of Torts: Liability for Economic Harm § 3 cmt. a (Am. L. Inst., Tentative Draft No. 1, 2012))); *Peagler v. Phx. Newspapers, Inc.*, 114 Ariz. 309, 315 (1977) ("We hold the standard adopted in the Tentative Draft of the . . . Restatement (Second) of Torts . . . is the standard to be followed in this State.").

### A.

**¶24**        Restatement § 3 offers an effective modification procedure that fairly balances the public policies of economic efficiency and consumer protection:

> (a) A modification proposed by the business of a standard contract term in a consumer contract governing an ongoing relationship is adopted if the business demonstrates that:
>> (1) the consumer received reasonable notice of the proposed modified term and a reasonable opportunity to review it;
>> (2) the consumer received a reasonable opportunity, including reasonable notice of the opportunity, to reject

---

[2] To preserve the at-will nature of the relationship, businesses must be allowed to terminate the relationship if the consumer refuses to accept the new terms.  Accordingly, Restatement § 3 balances consumer and business interests by recognizing this termination power subject to certain requirements: Businesses must expressly reserve this termination power in the agreement's initial terms, and they may exercise it only if termination will not cause "unreasonable cost, loss of value, or personal burden."  Restatement § 3(b).

the proposed modified term and continue the contractual relationship under the existing term, and;

(3) the consumer received reasonable notice that continuing the contractual relationship without rejecting the proposed modified term will result in the modification being adopted; and

(4) the consumer either:

(A) manifested assent to the modified term, or

(B) did not reject the proposed modified term and continued to take the benefit of the contractual relationship after the expiration of the rejection period provided in the proposal.

*Id.* Thus, Restatement § 3's central rule is that a business's changes of its standard contract terms are binding on its at-will consumers if (1) the consumers received reasonable notice of the changes and of an opportunity to opt out without penalty; and (2) the consumer continues to do business past a reasonable rejection period. *Id.* There is no actual notice requirement. *Id.*

**B.**

**¶25** Restatement § 3's position merits our adoption—it is consistent with Arizona law and sets forth sound policy. Notably, it aligns with our prior decisions recognizing effective modification through silent conduct. *See, e.g., Hagin*, 88 Ariz. at 162 (finding effective modification of an implied term allowing late payments where the offeree received constructive notice that strict compliance with the agreement's express payment schedule would be thereafter required and the offeree failed to object); Restatement (Second) § 19(3) ("The conduct of a party may manifest assent even though he does not in fact assent.").

**¶26** Restatement § 3's approach also permits businesses to readily update their terms, which facilitates economic efficiency in the context of standardized contracts. *Darner*, 140 Ariz. at 391 (characterizing standardization as "essential 'to a system of mass production and distribution.'" (quoting Restatement (Second) § 211 cmt. a)). Similarly, by rejecting an actual notice requirement, Restatement § 3 simplifies business operations and reduces transaction costs to the advantage of all parties concerned. It makes little sense to require parties to quit their at-will relationship just to immediately resume it with additional terms. *See Johnson*, 886 N.W.2d at 392 ("We do not require formalistic language

terminating an at-will contract before a change in terms will be effective going forward.").

**¶27** We also recognize that Restatement § 3's position imposes several safeguards to protect consumers from unfair exploitation. For example, businesses must propose modifications in good faith, and new terms cannot undermine negotiated parts of the original bargain. Restatement § 3(c); *see also Rawlings v. Apodaca*, 151 Ariz. 149, 153 (1986) ("The law implies a covenant of good faith and fair dealing in every contract."); *Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 383 (1985).

**¶28** Consumers also must receive reasonable notice that their failure to opt out of proposed modifications constitutes acceptance, and they must be given a reasonable opportunity to opt out without penalty. Restatement § 3(a); *see also Duling v. Mid Am. Credit Union*, 521 P.3d 1145, 1154 (Kan. Ct. App. 2022) ("[F]ailure to opt-out of a voluntary arbitration program constitutes acceptance, especially where [it] is the exact form of acceptance [expressly] invited by the offer." (quoting *Rittenhouse v. GlaxoSmithKline*, No. 21-1836, 2021 WL 6197361, at *4 (E.D. Pa. Dec. 30, 2021))). At minimum, "reasonable notice" requires that the initial terms or the notice of the proposed modification expressly indicate the consumer's ability to opt out and that failure to do so manifests the consumer's binding assent. Restatement § 3(a); *see also Miracle-Pond v. Shutterfly, Inc.*, 19 CV 04722, 2020 WL 2513099, at *6 (N.D. Ill. May 15, 2020) (finding effective modification where the business gave notice of new terms pursuant to an express change-in-terms clause in the initial terms).

**¶29** These consumer safeguards supplement—and do not supplant—other contract defenses. *See* A.R.S. § 47-2302 (unconscionability); *Darner*, 140 Ariz. at 391–92 (reasonable expectations). In other words, the requirements for effective modification under Restatement § 3 do not preclude the application of other contract law.

## CONCLUSION

**¶30** We answer the first certified question in the affirmative. In an on-going, at-will, business-consumer relationship, effective modification of the relationship's governing terms occurs if the business demonstrably satisfies the requirements of Restatement § 3 (as set forth in the Opinion and as follows): Consumers must (1) receive express and reasonable notice of the business's right to unilaterally modify the agreement; (2) receive reasonable notice of new terms and the opportunity to opt out without

penalty; and (3) upon receiving actual or constructive notice of new terms, continue the business relationship past a reasonable opt-out period. Our holding does not foreclose the applicability of contract defenses. We decline to answer the second certified question as moot.