**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAY BENNETT, an individual; SIV BENNETT, an individual; KESHA MARKETING, INC., a Nevada S-Corporation, | No. 23-16082 |
| | D.C. No. 2:23-cv-01061-DGC |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| ISAGENIX INTERNATIONAL LLC, an Arizona Limited Liability Corporation, | |
| *Defendant - Appellant*, | |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted March 5, 2024
Las Vegas, Nevada

Before: Milan D. Smith, Jr., Mark J. Bennett, and Daniel
P. Collins, Circuit Judges.

Filed September 30, 2024

Opinion by Judge Collins;
Dissent by Judge Bennett

# SUMMARY[*]

### Preliminary Injunction / Arizona Contracts Law

The panel vacated the district court's preliminary injunction barring Isagenix International LLC from terminating a business relationship with plaintiffs Jay and Siv Bennett.

Plaintiffs were contracted to be associates with Isagenix. In May 2023, Isagenix informed plaintiffs that it had decided not to renew their accounts.

The panel noted that the only question before the panel was whether plaintiffs had shown that they were *likely* to succeed on the merits of their claims under the preliminary injunction *Winter* factors. Whether they *will* succeed on the merits remains to be determined in the parties' arbitration. The plaintiffs' claims ultimately hinged on whether the contracts at issue were validly modified to include the new provisions converting their contracts to ones that Isagenix could elect, at its sole discretion, not to renew.

Applying Arizona law concerning the modification of contracts, the panel held that if a contract is bilateral, then its terms cannot be modified absent an additional offer, acceptance, and consideration; but if the contract is unilateral, a business can change its standard contract terms

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

if consumers receive reasonable notice of the change with an opportunity to opt out without penalty. The panel concluded that the contracts at issue here were likely bilateral, and the plaintiffs were likely to succeed in establishing that the Arizona requirements for modifying such a contract have not been satisfied. The panel agreed with the district court's conclusion that the plaintiffs had shown the requisite likelihood of success to support preliminary injunctive relief.

Next, the panel turned to the question of irreparable harm. The panel held that a bargained-for limitation on *otherwise* available legal relief did not give rise to "irreparable harm" for purposes of equity. The panel held that the district court erred in treating the parties' contractual limitation on consequential damages as a basis for finding irreparable harm. Because the district court did not address plaintiffs' other theories of irreparable injury, the panel vacated the preliminary injunction and remanded for further proceedings.

Judge Bennett dissented. He agreed with the majority that the district court failed to properly analyze whether the plaintiffs faced irreparable harm absent an injunction. But because he believed that *Demase v. ITT Corp.*, 984 P.2d 1138 (Ariz. 1999) (evaluating bilateral agreements under Arizona law), did not resolve the contract analysis here, and the majority's reading of the case was too broad, he would reverse the district court's grant of a preliminary injunction as the plaintiffs failed to show a likelihood of success on the merits.

**COUNSEL**

Dominic E. Draye (argued), Andrew F. Halaby, and Kacie M. Donovan, Greenberg Traurig LLP. Phoenix, Arizona; Shalayne L. Pillar, Littler Mendelson PC, Phoenix, Arizona; for Defendant-Appellant.

Scott W. Wellman (argued), Wellman & Warren LLP, Laguna Hills, California, for Plaintiffs-Appellees.

**OPINION**

COLLINS, Circuit Judge:

For over two decades, Plaintiffs Jay and Siv Bennett, who are husband and wife, contracted to be "associates" with Defendant Isagenix International LLC ("Isagenix"), meaning that they were independent contractors who helped sell products as part of Isagenix's multi-level marketing business model. The Bennetts' relationship with Isagenix has been extremely lucrative. Jay Bennett has ranked among Isagenix's best-performing associates, and since 2002 the couple "ha[s] received and accepted a total of $22,316,170.55 in commissions and other bonus payments from Isagenix." The promise of such "long-term residual income and other benefits" is part of how Isagenix recruits associates and encourages them to devote time and effort to the company. In May 2023, Isagenix informed the Bennetts that it had decided not to renew their accounts, which were set to expire in June 2023. After this point, the Bennetts would cease to receive commission payments on the sales associated with those accounts. These sales constitute the Bennetts' sole source of income. The Bennetts sued

Isagenix for various claims and obtained a preliminary injunction barring Isagenix from terminating their business relationship.  This case involves Isagenix's appeal of that order.

"A plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  We affirm the district court's ultimate conclusion with respect to the likelihood-of-success factor. However, we hold that the district court erred in treating the parties' contractual limitation on consequential damages as a basis for finding irreparable harm.  Because the district court did not address the Bennetts' other theories of irreparable injury, we vacate its preliminary injunction and remand for further proceedings.

# I

Plaintiffs Jay and Siv Bennett enrolled as Isagenix "associates" in March 2002.  Associates are independent contractors through whom Isagenix sells its products, which largely focus on health and wellness.  An Isagenix associate receives a "position," which is an account corresponding to the associate's business transactions, and which Isagenix uses to track the associate's success for purposes of compensation.  Once an associate has reached the maximum amount of compensation available for any given position under Isagenix's compensation plan, that associate may request additional positions ("re-entry positions") from Isagenix for the purposes of expanding his or her business. Isagenix is a multi-level marketing company, which means

that its business model involves inducing associates to recruit more associates, who in turn form a selling organization below the associate who recruited them. This organization is known as a "downline." Associates communicate with and manage their downlines through an online Isagenix portal called the "Backoffice," and the success of any individual associate's downline determines in part how much residual income that associate makes through, among other things, sales commissions, bonus payments, and additional income-generating memberships.

At the time the Bennetts became associates in 2002, they entered into the "Isagenix Independent Associate Agreement" (the "IIAA"), which incorporated various Isagenix documents including the Isagenix "Policies & Procedures" ("P&Ps"), the Isagenix "Terms and Conditions," and the Isagenix "Compensation Plan." Over the course of their many years dealing with Isagenix, the Bennetts entered into two additional contracts that provided them with "re-entry positions," thus allowing them to expand their business and earn additional income. Isagenix granted the Bennetts the third and final of these "re-entry positions" in a May 2016 contract, the consideration for which included that all existing associate positions (as enumerated in the contract) became subject to the then-existing P&Ps and Compensation Plan. Unlike the Bennetts' original contract, which had incorporated the Terms and Conditions *in addition to* the P&Ps and the Compensation Plan, the May 2016 contract did *not* specifically reference the Terms and Conditions. Nor did the then-existing P&Ps purport to incorporate the Terms and Conditions. This contract also stated that the associate positions would be subject to the P&Ps and Compensation Plan "as amended in the future." Finally, the May 2016 contract stated that,

"[e]xcept as otherwise provided . . . , [the May 2016 contract] constitutes and contains the entire agreement and understanding between the parties concerning the subject matter of [the May 2016 contract], and supersedes and replaces all prior negotiations, proposed agreements or agreements, written or oral."

The associate positions listed in the May 2016 contract were all held in the name of Jay Bennett, though subsequently, on June 1, 2016, Siv Bennett also acquired a position in her own name. As both of these contracts were executed in 2016, all associate positions became subject to the P&Ps that were in effect between September 1, 2013 and March 27, 2017.[1] These P&Ps provided for termination for cause and a process by which associates could renew their membership, but they did not include any right for Isagenix to terminate associate positions at will. The P&Ps additionally stated that in "no event shall any Isagenix officer, director, employee, affiliate, successor, or assignee be liable for any . . . consequential damages, for any claims or actions resulting from or arising out of these Policies and Procedures or any other agreement you have entered into with Isagenix." "Isagenix" in this section was defined as "Isagenix International, LLC or any of its affiliates." The P&Ps also provided that the Isagenix membership could be renewed annually, including automatically, and did not state that Isagenix could decide not to agree to renewal of its own accord.

---

[1] The contract associated with the June 1, 2016 creation of Siv Bennett's own associate position is not in the record, but the parties appear to agree that it would have incorporated the then-existing P&Ps, Terms and Conditions, and Compensation Plan. The district court should clarify this point on remand.

Effective March 27, 2017, Isagenix published a new set of P&Ps, included in which was a provision allowing Isagenix "at its sole discretion" to "elect not to renew [an] Associate Contract."  Effective January 1, 2020, Isagenix also published a new set of Terms and Conditions, included in which was a provision stating that "Isagenix may . . . terminate your [Independent Associate Application and Agreement ('IAAA')] or Position at any time for any reason."  Also included in the January 2020 Terms and Conditions was a provision stating that the offeree "agree[s] to hold harmless, indemnify, and release Isagenix, its shareholders, officers, directors, employees and agents from and against . . . any claims for consequential . . . damages . . . for any reason whatsoever."  Isagenix subsequently updated its P&Ps, effective August 20, 2020, but these continued to mirror the language regarding consequential damages that had been in the P&Ps between September 1, 2013 and March 27, 2017.  As a result, the Terms and Conditions as updated in January 2020 and the P&Ps as updated in August 2020 contained slightly different language regarding the availability of consequential damages.  Isagenix eventually, in March 2023, updated its P&Ps to make the consequential-damages exclusion explicit there as well.  The August 2020 P&Ps also did not contain the provision in the January 2020 Terms and Conditions stating that Isagenix could terminate an associate position "at any time for any reason," but it continued to include the provision (initially added in the March 2017 P&Ps) that Isagenix could at its sole discretion elect not to renew an associate contract.

The Isagenix website requires associates to acknowledge that they agree to the P&Ps whenever they place an order. The Bennetts placed at least nine orders using the website between March 27, 2017 and May 30, 2020.  In January

2020, Isagenix also implemented a pop-up notice linking to its updated "Independent Associate Business Contract" and stating that it had made "some important amendments."  On five occasions between January 5, 2020 and February 14, 2020, the Bennetts clicked a box stating that they had "read, underst[oo]d, and agree[d] to the terms and conditions of the Independent Associate Business Contract."  It is unclear whether this was referencing the same document as the "Terms and Conditions of the Isagenix Independent Associate Application and Agreement" that had been updated on January 1, 2020.  Isagenix also sent an email newsletter to all of its associates on August 30, 2020 that included, among many other things, a notification that P&Ps section 3.5 ("Reenrolling After Cancellation; Eligibility") had been amended, and a hyperlink to the P&Ps.  The Bennetts received, and Siv Bennett opened, this email.  On May 1, 2020, Isagenix also emailed the Bennetts a disciplinary letter based on actions unrelated to this lawsuit. The letter stated that Isagenix was placing the Bennetts on probation for one year, during which Isagenix stated that it would conduct an investigation and assessment—the results of which it warned might result in a fine or termination. Nothing in the record suggests that these consequences ever materialized.

On May 25, 2023, Isagenix sent the Bennetts a letter stating that, pursuant to the P&Ps as incorporated into their associate contracts, it had decided not to renew the associate positions held by the Bennetts, which were set to expire in June 2023.

The Bennetts, together with their related closely held corporation ("Kesha Marketing, Inc."), filed a complaint in the United States District Court for the District of Arizona on June 9, 2023, seeking a declaratory judgment that the

nonrenewal provision added to the P&Ps in 2017 was invalid as applied to them.  The Bennetts also sought damages based on claims for breach of contract under different iterations of the IIAA, breach of the implied covenant of good faith and fair dealing, breach of oral contract, promissory estoppel, fraud, negligent misrepresentation, and tortious interference with business expectancy.  Also on June 9, 2023, the Bennetts filed an application seeking a temporary restraining order ("TRO") "enjoining Defendant Isagenix from further withholding their residual income and restricting access to their Backoffice."  On June 20, 2023, after holding a hearing, the district court denied the Bennetts' application for a TRO based on the insufficiency of the evidence and arguments before it.  The order denying the TRO stated that the Bennetts would file a preliminary injunction brief, which they subsequently did.  The district court entered the preliminary injunction on July 17, 2023.

Isagenix filed a motion to compel arbitration on July 28, 2023, and both parties stipulated to arbitration on August 7, 2023.  They also stipulated to a stay of all the Bennetts' claims save for those proceedings involving provisional relief such as the preliminary injunction.  On August 8, 2023, Isagenix timely filed its notice of appeal from the district court's grant of the preliminary injunction.  Isagenix did not seek a stay of the injunction pending appeal.

## II

The district court had subject matter jurisdiction over the Bennetts' lawsuit pursuant to 28 U.S.C. § 1332.  This court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).  We review the district court's issuance of a preliminary injunction for abuse of discretion.  *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir.

2022). We review the district court's "underlying legal conclusions *de novo*" and its "factual findings for clear error." *Id*. We may affirm a district court's grant of a preliminary injunction "on any ground supported by the record." *Sony Comput. Ent., Inc. v. Connectix Corp.*, 203 F.3d 596, 608 (9th Cir. 2000) (citation omitted).

As noted earlier, the decision whether to grant a preliminary injunction involves the application of a four-factor test. "To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 490 (9th Cir. 2023) (citing *Winter*, 555 U.S. at 20, 22–23). We have adopted a sliding-scale approach to the *Winter* factors, stating that "'*serious questions* going to the merits' and a hardship balance that tips *sharply* toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (emphasis added). We have also held that if a movant fails to meet the threshold inquiry of likelihood of success on the merits (or serious questions going to them), a court may decide to deny a preliminary injunction without considering the other factors. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

## III

In applying the *Winter* factors, we begin by analyzing the likelihood that the Bennetts will succeed on their substantive claims. In doing so, we emphasize that we have only been presented with the question whether the Bennetts have

shown that they are *likely* to succeed on the merits.  Whether they *will* succeed on the merits remains to be determined in the parties' arbitration, and nothing in our ruling is meant to dictate the outcome of those proceedings.

## A

The Bennetts' claims ultimately hinge on whether the contracts at issue were validly modified to include the new provisions converting their contracts to ones that Isagenix could elect, at its sole discretion, not to renew.  This raises an issue of state law, and the parties have provided no basis for questioning the district court's assumption that the relevant contract issues were likely to be governed by Arizona law.  Accordingly, rather than rely (as the district court did) on Ninth Circuit contract cases (which happened to involve California law), we consider this issue in light of the applicable Arizona precedents.

As the Arizona Supreme Court explained in *Cornell v. Desert Financial Credit Union*, 524 P.3d 1133 (Ariz. 2023), Arizona law concerning the modification of contracts "distinguishes between bilateral contracts and unilateral contracts." *Id*. at 1136.  "Bilateral contracts consist of an exchange of promises," whereas "unilateral contracts are formed upon the offeree's acceptance by performance." *Id*. If a contract is bilateral, then "its terms cannot be modified absent an additional offer, acceptance, and consideration." *Id*. (citing *Demasse v. ITT Corp.*, 984 P.2d 1138, 1144 (Ariz. 1999)).  But with respect to *unilateral* contracts, the Arizona Supreme Court in *Cornell* adopted § 3 of the Restatement of Consumer Contracts, under which "a business's changes of its standard contract terms are binding on its at-will consumers if (1) the consumers received reasonable notice of the changes and of an opportunity to opt out without

penalty; and (2) the consumer continues to do business past a reasonable rejection period." 524 P.3d at 1139 (citing RESTATEMENT OF CONSUMER CONTRACTS § 3 (Am. L. Inst., Tentative Draft No. 2, 2022)). Given this important distinction concerning the applicable contract-modification principles, we first address whether the Bennetts' contracts with Isagenix are best characterized as bilateral or unilateral contracts.

In distinguishing between a bilateral and a unilateral contract, *Cornell* noted that an exchange of promises involving an expressed expectation of an enforceable "security" in the parties' continuing relationship (such as an employment relationship) would indicate that the parties' contract is bilateral. 524 P.3d at 1137–38. By contrast, an "at-will" agreement, even one involving "on-going, consumer-business relationships," would be a unilateral contract. *Id*.; *see also id*. at 1135–37 (holding that the contract at issue in *Cornell*, even though in writing, was one that either side could cancel at will "at any time" and was "unilateral"). Viewed through that lens, we conclude that the contracts at issue here likely should be viewed as bilateral.

The relevant agreements here are not open invitations that can only be accepted by performance. Rather, they are an exchange of promises between the company and the contractor—most fundamentally, the promise to sell Isagenix products in exchange for a commission, bonus payments, and additional income-generating memberships depending on the associate's success. The terms governing these contracts are memorialized in written agreements and signed by both parties. Importantly, they contain the sort of indicia of relationship security that *Cornell* noted would signify a bilateral contract rather than a unilateral one. The

P&Ps in place when all the accounts at issue in this case were either opened or last reincorporated provided for an annual, renewable term of membership, and specified the causes for which an associate position could be terminated. Such provisions, at least prior to the modification that is at issue in this case, stand in marked contrast to the "at-will" employment and consumer contracts that the Arizona Supreme Court characterized as "unilateral" in *Cornell*. *See id*. at 1136–37.

Having concluded that the agreements here should likely be characterized as bilateral, the next question is whether the requirements for modifying such a contract under Arizona law have been met. We conclude that the Bennetts are likely to succeed in establishing that they have not been satisfied.

As explained in *Demasse*, once a bilateral contract has been formed, the following requirements must be met in order to modify it: "(1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration." 984 P.2d at 1144 (citations omitted); *see also Cornell*, 524 P.3d at 1136 ("Once a bilateral contract is formed, its terms cannot be modified absent an additional offer, acceptance, and consideration."). Moreover, a mere continuation of the relationship "is not sufficient consideration to support a modification." *Demasse*, 984 P.2d at 1145.

Isagenix contends that the Bennetts agreed to the 2017 nonrenewal provision in the P&Ps (under which they were eventually terminated) by placing product orders on the Isagenix website that were accompanied by a conspicuous notice stating that "[b]y placing this order, you are agreeing to the Isagenix International Policies and Procedures," together with a hyperlink to the document. Isagenix

additionally argues that the Bennetts agreed to the 2020 at-will termination provision in the Terms and Conditions by clicking a box acknowledging that they had "read, underst[oo]d, and agree[d] to the [latest] terms" when logging into their Backoffice. Finally, Isagenix argues that the Bennetts had adequate notice of the change to the associate contract because it sent them an email that, among other things, included a hyperlinked notice that the P&Ps had been updated and because it sent them a disciplinary letter informing them that they had to comply with company policies.

Even if the email notice and letter or the login acknowledgement had provided the Bennetts with adequate notice of a change to the P&Ps or Terms and Conditions, respectively, neither involved any additional exchange or consideration. Of the three vehicles for modification that Isagenix proposes, therefore, only the order placements even arguably include adequate consideration under *Demasse*. However, Isagenix runs into a different problem in trying to tie its contract modification to the order placement, namely, *Demasse*'s notice requirement. According to *Demasse*, valid consent to a contract modification requires that an offeree have more than simple "awareness of or receipt" of the proposed modification. 984 P.2d at 1146 (citation omitted). Instead, the offeree "must be informed of any new term, aware of its impact on the pre-existing contract, and affirmatively consent to it to accept the offered modification." *Id*. Accordingly, even assuming *arguendo* that placing orders in furtherance of one's contractual duties as an associate constitutes independent consideration rather than a mere continuation of the relationship, Isagenix seems unlikely to meet its "burden . . . to show that the [Bennetts] assented with knowledge of the attempted modification and

understanding of its impact on the underlying contract." *Id*. In comparison to the clear statement reincorporating the P&Ps into existing account positions that were contained in previous contract modifications executed between the Bennetts and Isagenix, the order placements, without more, do not show that the Bennetts knew of and understood the attempted modification and its impact.

We do not think that a different conclusion is warranted based on the fact that the relevant agreements contained a provision stating that the Bennetts' account positions would be subject to the P&Ps "as currently published or as amended in the future." That language, without more, does not establish that Isagenix thereby had a unilateral right to amend any and all provisions of the agreement, including the crucially important associate-security provisions providing for automatic renewal and providing only for termination for cause.[2]

## B

Isagenix nonetheless argues that the Bennetts cannot establish the requisite likelihood of success on the merits for

---

[2] The dissent would read *Demasse*'s "stringent modification rule," *Cornell*, 524 P.3d at 1137, as being limited strictly to the employment context and as not applicable to other types of contractual arrangements involving long-term relationships and specific provisions creating an expectation of continued security in such relationships. *See* Dissent at 27–28. We disagree. What distinguished the employment relationship in *Demasse* from the "at-will, on-going, consumer-business relationship[]" at issue in *Cornell* was the "expectation of job security" reflected in the employment contract. *Cornell*, 524 P.3d at 1137–38 (citation omitted). As this case illustrates, employment relationships are not the only ones that involve clear contractual expectations of relationship security, and we are reluctant to conclude that the Arizona Supreme Court would construe *Demasse* as narrowly as the dissent would.

purposes of preliminary injunctive relief because the Bennetts' very ability to seek such relief *itself* assertedly rests on the very same contract modifications that they are attacking. This argument is unavailing.

The arbitration agreement to which all of the Bennetts' accounts were subject prior to 2017 stated that "[a]ny controversy or claim arising out of, or relating to" the P&Ps "shall be settled by arbitration." It was the March 2017 update to the P&Ps—the update that the Bennetts argue was not a valid modification—that added a provision explicitly stating that "[n]othing in the arbitration provision prohibits either party from obtaining . . . equitable relief." Isagenix's argument sounds in estoppel, but for that argument to succeed, Isagenix would have to show that, in the prior absence of that express disclaimer, the Bennetts affirmatively lacked any right to obtain preliminary injunctive relief in court. However, without a further showing, the mere existence of an arbitration provision does not necessarily preclude a district court from awarding preliminary injunctive relief to preserve the status quo in advance of, and in support of, the arbitration. *See Toyo Tire Holdings of Ams. Inc. v. Continental Tire N.A., Inc.*, 609 F.3d 975, 979–82 (9th Cir. 2010); *cf. Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 867–68 (9th Cir. 2021). On this point, Isagenix has not shown that, under the prior agreements, the court lacked all authority to award injunctive relief.

\* \* \*

For the foregoing reasons, we agree with the district court's conclusion that the Bennetts had shown the requisite likelihood of success to support preliminary injunctive relief.

## IV

We turn, then, to the question of irreparable harm.  The district court based its finding of irreparable harm in this case solely on the fact that the applicable agreements limited the availability of consequential damages.[3]  The district court reasoned that, although the Bennetts arguably might normally be able to recover consequential damages for the asserted harms that the Bennetts claimed they would incur as an indirect consequence of suddenly losing access to their Isagenix income stream, the agreements' consequential-damages limitation would prevent them from doing so.  Therefore, in the district court's view, those harms were irreparable for purposes of deciding whether to award injunctive relief.  In this respect, we conclude that the district court erred.

Preliminary injunctive relief is an "'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 144 S. Ct. 1570, 1576 (2024) (citation omitted).  Courts will therefore not grant a preliminary injunction unless there is "no adequate legal remedy" for the harm toward which it is directed. *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citation omitted).  But the fact that a party has voluntarily chosen to *forego* a legal remedy does not mean that "no adequate legal remedy" exists in the sense traditionally required to obtain the extraordinary remedy of

---

[3] The district court mistakenly cited the provision in the *amended* March 2023 P&Ps "specifically provid[ing] that [the Bennetts] cannot recover consequential damages from [Isagenix]."  But the error is irrelevant, because (as Isagenix conceded at argument) the P&Ps in effect between September 1, 2013 and March 27, 2017—to which all of the Bennetts' account positions were undisputedly subject—*already* contained a consequential-damages limitation.

a preliminary injunction. We have generally stated that, when a harm is "largely self-inflicted," that fact "severely undermines [a] claim for equitable relief." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (simplified); *see also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at p. 138 (3d ed. 2013) ("[A] party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." (internal citation omitted)). To the extent that a relinquishment of what would otherwise be an adequate legal remedy results in a *self-inflicted irreparability* to the claimant's injury, similar reasoning suggests that such a self-inflicted posture should not suffice for purposes of this extraordinary equitable remedy.

While we have not previously spoken to the particular fact pattern presented here, the Third Circuit has stated that irreparable injury does not exist where the parties "contracted" into the harm they allegedly fear and thus "acted to permit the outcome which they find unacceptable." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); *see also Al Otro Lado*, 952 F.3d at 1008 (citing *Caplan*, 68 F.3d at 839). We see no reason why the rule should be different in this case. As we have explained, it would be strange to say that parties who have consciously waived a right to seek relief at law thereby acquire instead the extraordinary right to seek relief at equity. Indeed, such an argument would be hard to square with the settled principle that "the terms of a contract alone cannot require a court to grant equitable relief." *Barranco v. 3D Sys. Corp.*, 952 F.3d 1122, 1130 (9th Cir. 2020); *see also id*. ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be

preliminarily enjoined, this by itself is an insufficient prop." (citation omitted)).    While the present case—unlike *Barranco*—does not involve an explicit contractual *stipulation* that one or another harm is "irreparable," *see id*. at 1125, finding irreparable harm based on the waiver of consequential damages in this case would nevertheless effectively allow the parties to bargain for what, in practical terms, would be a right to injunctive relief.  Such a result does not cohere with equity's role as an extraordinary backstop for the inadequacy of legal relief.  We therefore hold that a bargained-for limitation on *otherwise* available legal relief does not give rise to "irreparable harm" for purposes of equity.

In setting forth our holding, we have emphasized the word "otherwise," because if there were in fact no adequate legal remedy to begin with, then the parties cannot be said to have *inflicted* injury upon themselves simply by reciting that fact in their contract.  But the district court here did not reach that distinct question—*i.e.*, it did not consider whether, in the *absence* of the parties' contractual limitation of the recovery of consequential damages, the remedies available to the Bennetts under the common law would still have been inadequate.  We express no view on that question.

Because the district court explicitly declined to address the Bennetts' remaining alternative arguments for finding irreparable harm, we leave those issues for the district court on remand.  We hold only that the particular ground that the district court gave for finding irreparable harm was erroneous.[4]

---

[4] On remand, in the event that the district court finds irreparable injury, it will then need to reassess, in light of its conclusions on that score, the

\*        \*        \*

For the foregoing reasons, we vacate the district court's preliminary injunction and remand for further proceedings.

**VACATED and REMANDED.**

---

BENNETT, Circuit Judge, dissenting:

I agree with the majority that the district court failed to properly analyze whether the Bennetts face irreparable harm absent an injunction.  But because I believe that *Demasse v. ITT Corp.*, 984 P.2d 1138 (Ariz. 1999), does not resolve our contract analysis here, I would reverse the district court's grant of a preliminary injunction.

Since at least 2013, the Bennetts have agreed to and operated under Isagenix's Policies and Procedures ("P&Ps").[1]  The P&Ps contain a unilateral modification provision, which, "[u]pon proper notification," enables Isagenix "at its sole discretion, [to] amend the [Independent Associate Application and Agreement ("IAAA")] Terms and Conditions, the Policies, the Compensation Plan, the Guidance Documents, and any other materials pertaining to [their] Isagenix business."  Since at least March 2017, the P&Ps have permitted Isagenix to elect not to renew an associate's contract.

---

remaining factors concerning the balance of equities and the public interest.

[1] As the majority explains, the contract creating Siv Bennett's associate position is not in the record.  Maj. at 7 n.1.  I assume that Siv Bennett's June 2016 contract incorporated the then-existing P&Ps, Terms and Conditions, and Compensation Plan.

As the majority notes, under Arizona law, bilateral agreements such as the one here are evaluated under *Demasse*.  Maj. at 14–16.  *Demasse* requires "(1) an offer to modify the contract, (2) assent to or acceptance of that offer, and (3) consideration."  984 P.2d at 1144.  The requisite "offer to modify" involved here is the 2017 P&Ps' nonrenewal provision allowing Isagenix to elect to not renew an associate's contract.  The majority concludes that it "seems unlikely" that Isagenix satisfied the second *Demasse* requirement through a conspicuous notice included on the Isagenix website, informing users that "[b]y placing this order, you are agreeing to the Isagenix International Policies and Procedures."  Maj. at 14–16.  I disagree.

While Arizona has yet to rule on the enforceability of sign-in wrap agreements, Isagenix's website and accompanying notice satisfy our court's test for inquiry notice as stated in *Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505, 515 (9th Cir. 2023). While *Oberstein* applied California law, it did so through analysis of general contract principles.  *Id.* at 512–15.  Those same basic contract principles apply in evaluating contracts in Arizona. *See Jones v. Chiado Corp.*, 670 P.2d 403, 405 (Ariz. Ct. App. 1983) ("[W]hen a party has an equal opportunity to read and examine a contract with the other party, it is his duty to do so, and, if he fails, he will not be permitted to avoid it on the ground that he did not read it or supposed it was different in its terms from what it really was." (alteration in original) (quoting *Mut. Benefit Health & Accident Ass'n v. Ferrell*, 27 P.2d 519, 523 (Ariz. 1933), *overruled in part on other grounds by Occidental Life Ins. Co. v. Bocock*, 266 P.2d

1082, 1087–88 (Ariz. 1954))).  Thus, I would find Isagenix satisfied the second *Demasse* requirement.**[2]**

The majority holds that the notice here is insufficient to precipitate valid consent to the contract modification because it does not inform the offeree of "any new term" or make the offeree "aware of its impact on the pre-existing contract."  Maj. at 15 (quoting *Demasse*, 984 P.2d at 1146).  But the Arizona Supreme Court has recently confirmed that "[t]here is no actual notice requirement" in Arizona for the unilateral modification of contract terms.  *Cornell v. Desert Fin. Credit Union*, 524 P.3d 1133, 1139 (Ariz. 2023).  The dispositive facts in *Demasse* were that the employees "were not informed that continued employment—showing up for work the next day—would manifest assent, constitute consideration, and permit cancellation of any employment rights to which they were contractually entitled," and as such "that consideration would not have been bargained for and would not support modification."  984 P.2d at 1146.

The website notice from Isagenix clearly informed the Bennetts that "[b]y placing this order, you are agreeing to the Isagenix International Policies and Procedures" and provided a link to the express terms of the P&Ps.  For many

---

[2] Of course, this would just be a prediction of how the Arizona Supreme Court would rule.  "When interpreting state law, a federal court is bound by the decision of the highest state court."  *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990) (citing *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986), *as modified on denial of reh'g*, 810 F.2d 1517 (9th Cir. 1987)).  "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."  *Id.* at 1239 (citing *Dimidowich*, 803 F.2d at 1482; *Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir. 1985)).

years, the Bennetts ranked among Isagenix's best-performing associates, and since 2002 have received and accepted "a total of $22,316,170.55 in commissions and other bonus payments" from Isagenix. This case is not one involving a short-term contractual relationship between unsophisticated parties; it is one involving two wealthy parties with a longstanding and lucrative business agreement.

I disagree with the majority that Isagenix somehow failed to sufficiently parse out the individual modifications for the Bennetts to review. Maj. at 15–16. The Bennetts had "an equal opportunity to read and examine [the] contract," they had the "duty to do so," and their failure to discern the changed terms does not constitute permission to avoid the contract on the ground that they "supposed [the agreement] was different in its terms from what it really was." *Jones*, 670 P.2d at 405 (quoting *Mut. Benefit Health*, 27 P.2d at 523). The Bennetts understood that the Associate Contract was periodically updated by Isagenix and that they would be bound to those changes. The P&Ps were updated in 2003, 2005, 2006, 2007, 2008, 2013, 2017, and 2020, and the Bennetts continued operating under these P&Ps after each change. When Jay Bennett became an Associate in 2002, the then-current terms of the P&Ps included a provision permitting Isagenix to amend the P&Ps over time. The same was true when Siv Bennett became an associate in 2016.

Even beyond the P&Ps themselves, the Bennetts reaffirmed their understanding of Isagenix's ability to unilaterally modify the terms by executing additional agreements. For instance, in 2012, Jay Bennett entered into a "Special Access Confidentiality and Non-Solicitation Agreement" with Isagenix, in which he acknowledged that his "special access" may be revoked "if [he] violate[d] . . .

the Isagenix [P&Ps], as may be amended from time to time," and he agreed to "understand and comply with the P&Ps" and "all of the applicable rules, guidelines and best practices as may be published from time to time." When Jay Bennett applied for and received additional positions from Isagenix in 2013 and 2016, he again reaffirmed his agreement and promised to comply with "all Isagenix Policies and Procedures and the Compensation Plan as currently published *or as amended in the future*." When Isagenix amended the P&Ps to allow for unilateral nonrenewal of Associate contracts in 2017, it did so by amending the P&Ps, to which all Associates, including the Bennetts, agreed.

Isagenix posted the revised P&Ps on its website through which *every* Associate accesses the Isagenix ordering platform. By using the website, each Associate acknowledges that "[b]y placing this order, you are agreeing to the Isagenix International Policies and Procedures," and that acknowledgment provides a hyperlink to the P&Ps that contain the unilateral nonrenewal provision. From March 27, 2017, when Isagenix implemented the nonrenewal provision, to May 30, 2020, the Bennetts placed at least nine orders via the online ordering platform. Therefore, the Bennetts specifically affirmed that they agreed to the nonrenewal provision *at least nine times*. When Isagenix again revised the P&Ps in 2020, this time to update its privacy policy, it implemented a pop-up notice requiring each Associate to check a box stating that he or she had "read, understood, and agreed to the terms." Five times on three separate dates, the Bennetts logged into the Isagenix website and clicked the box affirming that they read, understood, and agreed to the Terms and Conditions of the Associate agreement. Those terms included the unilateral nonrenewal provision. In total, there were at least *fourteen*

*times* that the Bennetts affirmed they understood the P&Ps or their Associate agreement when those procedures and agreements contained the unilateral nonrenewal provision.

Even if this were incorrect and the website notice was lacking, there is no claim that the termination letter itself failed to put the Bennetts on notice that the terms of the P&Ps had changed.  That letter clearly stated that Isagenix had the discretionary authority not to renew the agreement with the Bennetts and referenced Section 3.4 of the amended P&Ps.  While the notice provided by the termination letter would not impact the Bennetts' rights *prior* to receipt of the letter, it settles the issue of notice for future activity, such that a preliminary injunction would not be warranted, as, obviously, an injunction covers only future actions.

The primary issue in this case is whether Isagenix's 2017 nonrenewal modification satisfies the third *Demasse* requirement: consideration.  The majority recognizes a distinction, which in my mind is dispositive, between this case and *Demasse*.  Different from *Demasse*, "the relevant agreements [here] contained a provision stating that the Bennetts' account positions would be subject to the P&Ps 'as currently published or as amended in the future.'"  Maj. at 16.

As the Arizona Supreme Court noted, the contract at issue in *Demasse* "did not expressly allow unilateral changes to the terms."  *Cornell*, 524 P.3d at 1137 (citing *Demasse*, 984 P.2d at 1141).  As explained by *Cornell*, the *Demasse* court answered a specific certified question about employment contract modifications, and analyzed a contract that did not "allow unilateral changes to the terms," and "assumed that the contract was bilateral," treating the term at issue as "creating an implied-in-fact, bilateral, contractual

term." *Id.* (citing *Demasse*, 984 P.2d at 1141–42). We have no employment contract here, nor an implied-in-fact contractual term. Instead, we have an express unilateral modification provision, which the parties have mutually agreed to and operated under for more than a decade.

I believe the majority's reading of *Demasse* is far too broad. *Demasse* focused specifically on employment agreements. The question certified to the Arizona Supreme Court asked:

> Once a policy that an employee will not be laid off ahead of less senior employees becomes part of the employment contract . . . , as a result of the employee's legitimate expectations and reliance on the employer's handbook, may the employer thereafter unilaterally change the handbook policy so as to permit the employer to layoff employees without regard to seniority?

*Demasse*, 984 P.2d at 1140. The Arizona Court of Appeals has since clarified that "*Demasse* was an *employment* security case based on the *employee* handbook" and refused to extend *Demasse*'s analysis to employment benefits cases. *Gamez v. Brush Wellman, Inc.*, 34 P.3d 375, 381 (Ariz. Ct. App. 2001) (emphasis added). The majority contends *Demasse* extends to all relationships with "clear contractual expectations of relationship security," Maj. at 16 n.2, but the question certified to the Arizona Supreme Court and subsequent interpretation by the Arizona Court of Appeals are not nearly so broad.

In *Demasse*, the court found continued employment to be insufficient consideration to enforce a unilateral

modification (with no modification term in the contract), because "[a]ny other result brings [the court] to an absurdity: the employer's threat to breach its promise of job security," that is firing a senior employee, "provides consideration for its rescission of that promise." 984 P.2d at 1145. But there is no absurdity here; indeed the reverse is true. The Bennetts were independent contractors, not employees, meaning they did not enjoy the seniority protections at issue in *Demasse*. And *Demasse* established a special rule for a limited subset of employment cases, which the Arizona courts have not even extended to a broader set of employment cases. Thus, *Demasse* is not dispositive here—especially when, unlike in *Demasse*, the Bennetts and Isagenix agreed to a unilateral modification provision expressly allowing the modification at issue.

The majority's view holds the agreed-to unilateral modification provision meaningless based on a case that involved no such provision. However, "the contract rule is and has always been that one should keep one's promises." *Id.* at 1148. The majority's restriction of this unilateral modification provision is contrary to the plain text of a provision that places no such limitation on Isagenix's ability to modify the terms in the future so long as it notifies its contractors, which it has done. And here, unlike in *Demasse*, there is no unfairness of any kind. The Bennetts profited from their contractual arrangement to the tune of roughly $2 million per year since the nonrenewal provision was added in 2017. The Bennetts reaped over $20 million in earnings over the course of their two-decade relationship with Isagenix, but now they want to disavow one term because allowing Isagenix to enforce the agreed-to contractual provision would be to the Bennetts' financial detriment. But that is simply not how contract law works—in Arizona or

anywhere else, to my knowledge.  I would reverse the district court's grant of a preliminary injunction, as the Bennetts have failed to show a sufficient likelihood of success on the merits, and thus I respectfully dissent.